UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                               :

PATRIARCH PARTNERS, LLC,                 :
                                               :

      Plaintiff,                         :
                                               :      Civil Action No.:

         -*vs*-                      :      1:16-CV-2277-VEC
                                             :

AXIS INSURANCE COMPANY,          :
                                               :

      Defendant.                      :
                                               :
-------------------------------------------------------------------X

 

### MEMORANDUM OF LAW IN SUPPORT OF
### AXIS INSURANCE COMPANY'S
### MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<b><u>Page</u></b>

I.     INTRODUCTION ...........................................................................................1

II.    STATEMENT OF FACTS ............................................................................2

        A.     The SEC's Investigation of Patriarch from 2009 - 2011 ........................3

               1.     At First the SEC Conducts an "Informal Investigation" ...........................3

               2.     The SEC Issues Its Formal Order of Investigation in June 2011 ..............4

               3.     The SEC Seeks Documents and Testimony from Two Former Executives and Issues Its First Formal Subpoena to an Insured ..............5

               4.     Patriarch Learns of the Formal Order of Investigation and ███████ Subpoena ....................................................................6

               5.     Patriarch Learns Of The Impending Subpoena To It From the SEC..........6

        B.     As the SEC Investigation Escalates, Patriarch Renews Its Existing Coverage and Purchases Additional Coverage from AXIS in August 2011 ..........7

               1.     Patriarch Renews Without Disclosing the Pending SEC Investigation ...............................................................................7

               2.     Extensive Negotiations Between Patriarch and AXIS Led To Patriarch Executing the Warranty With a Clear Understanding of AXIS's Intent To Exclude "Any Existing Circumstances"......................9

        C.     AXIS Issues Its Excess Policy to Patriarch .........................................10

        D.     Patriarch Submits Notice of the SEC Investigation to AXIS for Coverage .........11

III.   ARGUMENT ...........................................................................................12

        A.     Summary Judgment Should Be Granted Where, As Here, the Contract Language is Unambiguous and Can Be Interpreted Based on Undisputed Facts and the Law ...................................................................12

        B.     AXIS is Entitled to Summary Judgment Because the SEC Investigation Is Deemed A Claim "First Made" Prior to the AXIS Policy Period ......................14

        C.     AXIS is Entitled to Summary Judgment Because the Prior or Pending Exclusion Operates Independently to Bar Coverage for Patriarch's Claim .........18

        D.     AXIS is Entitled to Summary Judgment Because the Warranty Executed by Patriarch Bars Coverage ..................................................20

CONCLUSION ...................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABM Mgmt. Corp. v. Harleysville Worcester Ins. Co.*,
   112 A.D.3d 763, 977 N.Y.S.2d 330 (2013)................................................................ 13

*BioChemics, Inc. v. Axis Reinsurance Co.*,
   83 F. Supp. 3d 405 (D. Mass. 2015)............................................................ 15, 16, 17

*Brown v. Eli Lilly & Co.*,
   654 F.3d 347 (2d Cir. 2011) .......................................................................... 12

*CheckRite Ltd. v. Ill. Nat'l Ins. Co.*,
   95 F. Supp. 2d 180 (S.D.N.Y. 2000) ............................................................ 14

*Citak & Citak v. St. Paul Travelers Cos.*,
   No. 07 Civ. 5459, 2008 U.S. Dist. LEXIS 35914 (S.D.N.Y. April 28, 2008) ........ 21

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
   309 F.3d 76 (2d Cir. 2002) ............................................................................ 13

*McGrail v. Equitable Life Assurance Soc'y*,
   292 N.Y. 419, 55 N.E.2d 483 (1944) ............................................................ 13

*Morgan Stanley Group, Inc. v. New England Ins. Co.*,
   225 F.3d 270 (2d Cir. 2000) .......................................................................... 13

*Nat'l Stock Exch. v. Fed. Ins. Co.*,
   No. 06 C 1603, 2007 U.S. Dist. LEXIS 23876 (N.D. Ill. March 30, 2007) ............ 15

*Nat'l Union Fire Ins. Co. v. Stroh Cos.*,
   265 F.3d 97 (2d. Cir. 2001) .......................................................................... 13

*U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*,
   256 F. Supp. 2d 176 (S.D.N.Y. 2003), *aff'd*, 88 F. App'x 441 (2d Cir. 2004) ........ 12

*Univ. of Pittsburgh v. Lexington Ins. Co.*,
   No. 13-cv-335, 2016 WL 7174667 (S.D.N.Y. Dec. 8, 2016).............................. 21

*Weaver v. AXIS Surplus Ins. Co.*,
   639 F. App'x 764 (2d Cir. 2016) .............................................................. 18, 19

*XL Specialty Ins. Co. v. Agoglia*,
   No. 08 Civ. 3821, 2009 U.S. Dist. LEXIS 36601 (S.D.N.Y. March 2, 2009) ........ 21

**OTHER AUTHORITIES**

17 C.F.R. § 203.4 et seq. ..............................................................................................passim

30134020v7

## I.      INTRODUCTION

Patriarch Partners LLP, while in the throes of an active, formal SEC investigation, purchased a new excess "claims made" insurance policy from AXIS Insurance Company— without disclosing the existence of the formal investigation.

In fact, by the time Patriarch asked AXIS to issue a new $5,000,000 excess policy of directors and officers liability insurance (paying just $47,500 to AXIS for the extra coverage):

- The SEC had been investigating Patriarch for more than 20 months.

- The SEC had issued a Form 1662 "statement of rights" to Patriarch at least twice.

- Patriarch had been producing documents in response to multiple SEC letters.

- The SEC had commenced a formal investigation against Patriarch (a "formal investigatory proceeding" under SEC regulations, 17 C.F.R. § 203.4).

- Patriarch had agreed to indemnify two former executives (represented separately by two prominent white collar defense firms) who had been contacted by the SEC.

-  The SEC had issued a formal subpoena to one of these former executives for documents relevant to the Patriarch investigation.

- The SEC had convened and held what it described as a "proffer" meeting in Washington, D.C. with Patriarch's defense counsel.

- The SEC had warned Patriarch that another formal subpoena was coming directly to Patriarch.

- Patriarch had incurred approximately **$600,000** in defense counsel fees already ($400,000 in attorneys' fees of its own counsel responding to the SEC and over $200,000 in fees for its former executives), and the SEC's formal investigation was just beginning to ramp up:

None of this, however, was disclosed at the time by Patriarch—not to AXIS, and not to Patriarch's own broker. Not even to its own in-house litigation counsel. Not surprisingly, multiple independent reasons explain why Patriarch is not entitled to the coverage it seeks here for costs incurred defending against the SEC investigation and follow-on enforcement action (which are treated as a single claim for purposes of the insurance coverage). It is not a claim ***first***

*made* during the policy period. It is barred by the "prior or pending" claim exclusion in the AXIS Policy.[1] And it is barred by the terms of an express warranty and related exclusion for circumstances already known to Patriarch at the time it purchased the AXIS Policy. Patriarch's claim for coverage thus should be rejected on multiple grounds as a matter of law, discussed more fully below, and AXIS is entitled to final summary judgment in its favor.

## II.    STATEMENT OF FACTS

Patriarch is a private equity investment firm founded in 2000 by Lynn Tilton, who serves as Chief Executive Officer. [SOF ¶1].[2] As relevant here, Patriarch's business over the years has included taking over loans to distressed companies, as well as making new loans to distressed companies, all on favorable terms in order to gain a controlling interest in those companies and (in theory) turn them around financially. [*See generally* SOF ¶¶2-5].  Ms. Tilton and Patriarch bundled the distressed loans together into investment vehicles structured as Collateralized Loan Obligation funds ("CLOs") and raised over a billion dollars by selling notes to investors. [*See generally* SOF ¶¶6-9]. The notes would make money for investors so long as the distressed companies in the funds' portfolios (the "portfolio companies") generated cash flows by paying the principal and interest on their loans. [*Id.*]. Tilton and Patriarch managed the funds as Collateral Manager and in many cases ran the portfolio companies directly. [*Id.*]. For this work, they received substantial management fees—$200 million according to the SEC. [*Id.* at ¶10].

Patriarch became an AXIS insured for the first time on August 12, 2011. This is the date when Patriarch, through its insurance broker, asked AXIS to "bind" $5,000,000 in excess directors and officers liability ("D&O") coverage for a premium of $47,500, and when Patriarch

---

[1]    AXIS Excess Policy No. MNN762262/01/2011, issued to Patriarch effective July 31, 2011 to July 31, 2012 (the "AXIS Policy") [attached as Exh. A to Patriarch's Amended Complaint, D.E. 42-1].

[2]    All record citations are to the Statement of Undisputed Material Facts ("SOF") filed contemporaneously herewith.

agreed to provide a warranty letter (the "Warranty") attesting to its purported lack of knowledge

of any existing facts and circumstances that reasonably could give rise to a claim covered under

the AXIS Policy. Before turning to a discussion of the coverage, AXIS will discuss precisely

what Patriarch knew about the SEC's investigation, and when it knew it, as of August 12, 2011.

A.      **The SEC's Investigation of Patriarch from 2009 - 2011**

1.      **At First the SEC Conducts an "Informal Investigation"**

Patriarch first learned of the SEC's investigation in December 2009 when it received a

letter from the Enforcement Division of the SEC captioned "In the Matter of Patriarch Partners,

LLC (HO-11245)." [SOF ¶11]. This letter notified Patriarch that the SEC was conducting an

inquiry, sought voluntary production of documents and enclosed a copy of SEC Form 1662,

which provides certain instructions, warnings and advice about the recipient's rights and

obligations—what Patriarch's defense counsel referred to in her deposition as a "statement of

rights." [*Id.* at ¶12]. Patriarch retained outside counsel from the Brune & Richard law firm to

respond to the SEC on Patriarch's behalf. [*Id.* at ¶13]. Letters from the SEC continued for

another 18 months and referred to the matter during that time as an "informal investigation,"

through which the SEC sought and received additional information from Patriarch about its

CLOs including Zohar 2003-1 Ltd., Zohar II 2005-1 and Zohar III, Limited (collectively, the

"Zohar Funds"). [*Id.* at ¶14].

By June of 2011, it became evident that the SEC was not going away. In a May 27, 2011

letter from the SEC, the SEC issued an extensive set of new document and information requests

to Patriarch, sought to interview a Patriarch employee to explain the company's structure,

business and investments and enclosed another Form 1662. [SOF ¶15]. Notably, the SEC's May

2011 correspondence read every bit like a request for production of documents in formal

litigation, and the caption of the SEC investigation changed for the first time to *In the Matter of*

*Patriarch Partners, LLC* (HO-11665). [*Id.*]. As Patriarch soon learned, this updated case caption reflected the SEC's **formal** investigation against Patriarch.

2.     <strong>The SEC Issues Its Formal Order of Investigation in June 2011</strong>

The SEC issued an Order Directing Private Investigation and Designating Officers to Take Testimony against Patriarch on June 3, 2011—a "Formal Investigatory Proceeding" under the applicable federal regulations (the "Formal Order of Investigation"). [SOF ¶16 (citing 17 C.F.R. § 203.4(a)). The Formal Order of Investigation, captioned *In the Matter of Patriarch Partners, LLC* (HO-11665), authorized certain SEC officers to begin taking formal investigative measures like compelling the production of documents by issuing subpoenas and conducting interviews and taking testimony under oath. [*Id.* at ¶17]. Prior to the Formal Order of Investigation, the SEC had no authority to conduct formal proceedings such as subpoenas *duces tecum* or for live testimony. [*Id.* at ¶18]. *See also* 17 C.F.R. § 203.4.

The Formal Order of Investigation against Patriarch alleges, among other things, that from at least 2000 to June 3, 2011, "certain persons and entities involved in the structuring and marketing of the Patriarch CLOs, directly or indirectly, in the offer or sale or in connection with the purchase or sale of securities including [the Zohar Funds], may have been or may be employing devices, schemes, or artifices to defraud, obtaining money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were or are made, not misleading, or engaging in transactions, acts, practices or courses of business which operated . . . as a fraud or deceit upon any person." [SOF ¶19]. The Formal Order of Investigation states that Patriarch's actions are possible violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities and Exchange Act of 1934. [*Id.* at ¶20]. The Formal Order of

-4-

Investigation further asserts possible violations of Sections 206(1) and 206(2) of the Advisors Act. [*Id.*]

### 3. The SEC Seeks Documents and Testimony from Two Former Executives and Issues Its First Formal Subpoena to an Insured

Around the time the Formal Order of Investigation was issued, the SEC contacted two former Patriarch executives, █████████ and █████████, about providing documents and testimony relevant to the Patriarch investigation. [SOF ¶21].

In May 2011, the SEC contacted a former Patriarch executive, █████████, about providing an interview. [SOF ¶22]. Following this request, █████ sought indemnification from Patriarch for the fees and costs incurred by his defense counsel (Richard Weinberg of the Morvillo Abramowitz law firm) in responding the SEC's demands, which amounts Patriarch agreed to pay. [*Id.* at ¶23]. Patriarch's agreement to indemnify █████ was formalized in a June 21, 2011 letter from Weinberg to Patriarch, care of Patriarch's counsel Hillary Richard. [*Id.* at ¶24].

In June 2011, the SEC contacted █████████, another Patriarch executive. [SOF ¶25]. Pursuant to the Formal Order of Investigation, the SEC issued a formal subpoena to █████ dated July 1, 2011 compelling the production of documents relating to the Zohar Funds by July 22, 2011. [*Id.* at ¶26]. **The █████ Subpoena identified the relevant matter as the SEC's formal investigation against Patriarch as reflected in the June 3, 2011 Order.** [*Id.* at ¶27]. **The subpoena further sought to take █████████'s testimony under oath to occur in August 2011.** [*Id.* at ¶28].

Like █████, █████ sought indemnification from Patriarch for legal fees incurred in responding to the subpoena and related SEC matters. [SOF ¶29]. Again, Patriarch agreed and paid for █████ to have defense counsel (Lindi Beaudreault, then at the Shearman & Sterling law

firm). [*Id*]. Indeed, between ██████ and ██████, Patriarch incurred **over $200,000** in defense expenses by August 12, 2011. [*Id*. at ¶30].



██████'s ████████████████████████████████████████████████ ████████████████████████████████████████. [SOF ¶31]. Indeed, as reflected in the invoices sent to and paid by Patriarch, ██████'s counsel █████████████████ ████████████████████████████████████████████████ ██████████████████. [*Id*. at ¶32].

### 4. Patriarch Learns of the Formal Order of Investigation and ██████ Subpoena

Patriarch confirmed the formal nature of the SEC proceeding on June 13, 2011 ██████ ████████████████████████████████████████████████. [SOF ¶33]. In addition, Patriarch's defense counsel Susan Brune, a seasoned white collar attorney with expertise in handling SEC investigations, knew that the SEC could not issue subpoenas without having entered a formal order of investigation. [*Id*. at ¶34]. As such, knowing that that the SEC had issued a subpoena to ██████, Ms. Brune also knew the SEC investigation had advanced from informal to formal against Patriarch. [*Id*. at ¶35]. In this time period, Ms. Brune's and Ms. Richard's invoices reflect numerous conversations and emails with Lynn Tilton, as well as conversations with Weinberg and Beaudreault, about the SEC's investigation. [*Id*. at ¶36].

### 5. Patriarch Learns Of The Impending Subpoena To It From the SEC

Even as the SEC had initiated a formal investigatory proceeding against Patriarch and had issued a formal, mandatory subpoena to one of its former executive, the SEC continued to seek Patriarch's ostensibly "voluntary" cooperation. [SOF ¶37]. On July 5, 2011, Patriarch's attorneys participated in an all-day, in-person meeting with members of the SEC enforcement

staff in Washington, D.C. to discuss the Zohar Funds and other matters relating to Patriarch's business—a meeting described by SEC staff as a "proffer." [*Id.* at ¶38].

Following this "proffer meeting," Patriarch received an unequivocal confirmation ***from the SEC*** that its investigation was not over. On August 10, 2011, SEC staff spoke with Patriarch's counsel by telephone about additional information they needed to follow up on the July 5, 2011 proffer meeting and sent an email a day later confirming this conversation. [SOF ¶39.  In an August 11, 2011 email from the SEC to Brune & Richard—forwarded the same day to Ms. Tilton—the SEC requested Patriarch's continued cooperation in the production of more Zohar-related documents but warned Patriarch that a formal subpoena to the company was coming: "We ***will*** follow this voluntary request with a subpoena that may seek more information." [*Id*. at ¶40 (emphasis added)]. The SEC also issued a document preservation request, admonishing Patriarch to preserve "all communications with or about the ratings agencies or the trustees in connection with the Zohar deals." [*Id*. at ¶41]. Consistent with the SEC's demands to Patriarch, counsel at Brune & Richard drafted, and Patriarch circulated, a litigation hold email to its employees instructing them to retain documents and communications with Patriarch's ratings agencies. [*Id*. at ¶42]. As will be seen shortly, this back and forth between Patriarch and the SEC about the litigation hold and forthcoming subpoena to Patriarch occurred in the two days before Patriarch decided to purchase **an additional $5 million in D&O policy limits** from AXIS.

    **B.**    **As the SEC Investigation Escalates, Patriarch Renews Its Existing Coverage and Purchases Additional Coverage from AXIS in August 2011**

        **1.**    **Patriarch Renews Without Disclosing the Pending SEC Investigation**

On July 5, 2011—**the same day as the Washington, D.C. "proffer" meeting between the SEC and Patriarch**—Ms. Tilton met in person with Patriarch's insurance broker and

30134020v7

underwriters for various insurance companies, including AXIS, interested in potentially quoting primary and/or excess insurance coverage for Patriarch's impending insurance renewal. [SOF ¶43]. Ms. Tilton did not mention to her potential insurers the pending SEC investigation or the contemporaneous proffer meeting between her attorneys at Brune & Richard and the SEC. [*Id.* at ¶44].[3] Patriarch's broker, Stephen Blount from Willis North America, could not have told AXIS about the SEC investigation because Ms. Tilton did not mention or disclose the pending SEC Investigation to him. [*Id.* at ¶47]. Blount confirmed in his deposition that an SEC investigation is the exact type of pending matter a client should disclose to the broker. [*Id.* at ¶48].[4] Ultimately, Patriarch renewed the expiring $20 million insurance program effective July 30, 2011 for the July 31, 2011 to July 31, 2012 Policy Period with all of the existing insurance carriers. [*Id.* at ¶50].

Then, on August 9, 2011, Patriarch through its broker Willis asked AXIS to quote a new limit of $5 million that would augment the existing insurance program. [SOF ¶51]. AXIS sent its $5 million excess quote to Patriarch the same day. [*Id.* at ¶52]. Because Patriarch was a new risk to AXIS and was requesting new, higher limits, AXIS's quote included two important limitations. First, before AXIS would issue a policy, Patriarch would have to provide a signed and dated warranty statement. [*Id.* at ¶53]. Second, the AXIS Policy would contain three

---

[3]   In the underwriting process, Patriarch's broker suggested that Ms. Tilton "might have disclosed something" at the underwriter meeting and did not want anything disclosed at the meeting to be excluded by the Warranty—to which AXIS immediately replied that anything disclosed necessarily ***would*** be excluded: "Even if Lynn had disclosed *something* in the meeting there would not be new limit coverage and we don't have a schedule or knowledge of things that 'might' have been disclosed in order to specifically exclude them." [SOF ¶ 49].

[4]   Indeed, at the time when Ms. Tilton and Patriarch were in the process of renewing and increasing the existing D&O coverage, Ms. Tilton had not involved ***her own in-house attorneys*** in the SEC investigation. [SOF ¶ 45]. For example, Patriarch's Chief Litigation Officer, Carolyn Schiff, generally was responsible for reviewing Patriarch's legal expenses before they were paid, but Ms. Tilton conspicuously shielded Ms. Schiff from reviewing Patriarch's legal bills and those of the indemnified employees until after Patriarch had secured the renewal policies. [*Id.* at ¶ 46].

endorsements effective at inception, including "Pending & Prior Claim Date Endorsement- At Inception." [*Id.* at ¶54]. As Patriarch's broker explained to Patriarch, AXIS wanted to "eliminate the potential for AXIS to come on the program and be immediately hit with a claim that the claim that the client knew was close but hadn't been filed yet." [*Id.* at ¶55].

Upon receipt and review of the insurance quotes for the 2011-2012 policy period, as well as Blount's further explanation of coverage, Patriarch agreed to accept AXIS's quotation and requested to "bind" the additional $5 million in coverage from AXIS for a total of $25 million of coverage for the 2011-2012 renewal. [SOF ¶56].

> 2. **Extensive Negotiations Between Patriarch and AXIS Led To Patriarch Executing the Warranty With a Clear Understanding of AXIS's Intent To Exclude "Any Existing Circumstances"**

On August 22, 2011, Blount sent Patriarch the binders from the insurers, as well as a draft warranty letter for Patriarch to execute as agreed with AXIS (the "Warranty"). [SOF ¶57]. On August 25, 2011, Patriarch responded to Willis about the draft Warranty, attaching revisions. Patriarch noted that "given that Lynn (Tilton) may have made some disclosures in the [July 5, 2011] meeting with the underwriters, we'd like to have that point noted in the letter" and that the purpose of the Warranty is "to tell AXIS we know of no other undisclosed facts." [*Id.* at ¶58]. Willis forwarded Patriarch's comments and edits to AXIS. [*Id.* at ¶59].

AXIS disagreed, immediately rejecting Patriarch's proposed changes in a terse email stating that, even if Patriarch had disclosed something in the July 5, 2011 meeting, "there would not be new limit coverage and we don't have a schedule or knowledge of things that 'might' have been disclosed in order to specifically exclude them." [*Id.* at ¶60]. AXIS further stated "since we are simply using our excess policy we want it to be clear in the warranty that **the new limit is not for any existing circumstances**." [*Id.* at ¶61 (emphasis added)]. Upon receiving AXIS's response, Willis accurately conveyed to Patriarch that AXIS did "NOT agree with the

proposed warranty letter changes"; that AXIS was not covering circumstances already known at the inception date that might develop into a claim, "regardless if such potential claims were or were not disclosed in the July 5th underwriter meeting"; and that AXIS required the language in the Warranty "**to be clear that the new 5x20 limit is not applicable for any existing and known circumstances**." [*Id.* at ¶62]. Willis further explained to Patriarch that AXIS's policy form was "very basic and [AXIS ] rel[ies] on the warranty statement as [its] protection against **any such known situations** that might develop into a claim post-inception." [*Id.* at ¶63 (emphasis added)].

At that point, Patriarch advised Willis that Patriarch understood AXIS's concerns and believed they could be addressed with some proposed minor changes to the Warranty. [SOF ¶ 64]. Among other things, Patriarch ultimately agreed that the Warranty would be effective not on the date the policy went into effect, but instead when Patriarch and AXIS agreed to the terms of the AXIS Policy on August 12, 2011. [*Id.* at ¶65]. The final Warranty, as executed by Tilton, states that as of August 12, 2011 "neither [she] nor any other director or officer of Patriarch is aware of any facts or circumstances that would reasonably be expected to result in a Claim under the [AXIS] Policy." [*Id.* at ¶66]. The Warranty also makes coverage unavailable for any claim "relating to facts or circumstances that, as of the date of this letter [August 12, 2011], Patriarch was aware of and would reasonably have expected to result in a Claim covered by [the AXIS] Policy." [*Id.* at ¶67].

### C.  AXIS Issues Its Excess Policy to Patriarch

After Patriarch executed the Warranty, AXIS agreed to issue the AXIS Policy, effective on July 31, 2011. [SOF ¶68]. AXIS issued its final binder on September 15, 2011. [*Id.* at ¶69]. Once Willis provided AXIS with copies of all underlying insurance policies on March 5, 2012, AXIS immediately issued its new excess policy to Patriarch. [*Id.* at ¶70]. As Patriarch's 30(b)(6)

-10-

witness acknowledged in his deposition, Willis reviewed the AXIS Policy along with the underlying policies and advised Patriarch that the as-issued policies conformed to the binders. [*Id.* at ¶71].

The AXIS Policy provides a $5 million aggregate limit of liability excess of $20 million in underlying limits and the applicable retention set forth in the Continental Policy. [SOF ¶83]. The AXIS Policy states that the AXIS Policy is being issued to Patriarch in consideration of the $47,500 premium paid and "in reliance upon all information and representations provided or made available by the **Insureds** to the Insurer in connection with the underwriting" of the AXIS Policy (i.e., the Warranty). [*Id.* at ¶84]. Further, the Continental Policy is designated as the "Followed Policy," meaning the AXIS Policy generally follows form to the Continental Policy except where the AXIS Policy is different, in which case the AXIS Policy controls. [*Id.* at ¶85].

### D.   Patriarch Submits Notice of the SEC Investigation to AXIS for Coverage

On or about February 27, 2012, Patriarch received the subpoena it had been expecting from the SEC—a subpoena to Patriarch directly, seeking emails or instant messages from 2008 to the present for Tilton, ▮▮▮▮ and ▮▮▮▮ (the "2012 Subpoena"). [SOF ¶72]. The 2012 Subpoena was issued under the same caption as the SEC's May 25, 2011 document requests and later correspondence, the earlier ▮▮▮▮ subpoena and the Formal Order of Investigation. [*Id.* at ¶73]. On or about March 5, 2012, Willis, on behalf of Patriarch, notified AXIS and the other carriers of the 2012 Subpoena. [*Id.* at ¶74]. The March 5, 2012 notice was the first time Patriarch or its broker informed AXIS of the SEC investigation. [*Id.* at ¶75].

On March 7, 2012, Continental promptly acknowledged receipt of the 2012 Subpoena, concluding that all three individuals identified (Tilton, ▮▮▮▮ and ▮▮▮▮) were "**Insureds**" under the primary Continental Policy and that the 2012 Subpoena was a "**Claim**" within the meaning of the policy insofar as the subpoena "triggered coverage . . . as to all three

30134020v7

individuals." [SOF ¶76]. AXIS, for its part, also acknowledged Patriarch's notice of the SEC investigation as a Claim by incorporating Continental's coverage position. [*Id*. at ¶77]. Further, by letter dated October 7, 2013, AXIS reserved its rights on various grounds pending receipt of correspondence between the SEC and Patriarch pertaining to the SEC Investigation. [*Id*. at ¶78].[5]

On March 30, 2015, the SEC filed an administrative enforcement action captioned *In the Matter of Lynn Tilton; Patriarch Partners, LLC; Patriarch Partners, VIII, LLC; Patriarch Partners XIV, LLC; and Patriarch Partners XV, LLC*, Administrative Proceeding File No. 3-16462. [SOF ¶79]. In general terms, the SEC Enforcement Action alleged that Patriarch defrauded the Zohar Funds and their investors in violation of federal securities laws. [*Id*. at ¶80]. The Enforcement Action proceeded to trial before the SEC in October and November 2016 and is awaiting decision. [*Id*. at ¶81]. The Enforcement Action is treated as a single "Claim" with the SEC Investigation because they are "Interrelated Claims" pursuant to Section VI.E. of the Continental Policy. [*Id*. at ¶82].

## III.   ARGUMENT

### A.   Summary Judgment Should Be Granted Where, As Here, the Contract Language is Unambiguous and Can Be Interpreted Based on Undisputed Facts and the Law

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits, show 'that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly & Co*., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). Under New York law, "[t]he construction of an insurance contract is ordinarily a matter of law to be determined by the court." *U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.,* 256 F. Supp. 2d 176, 180 (S.D.N.Y.

---

[5]   Patriarch did not provide the information AXIS requested until years later—and it took ***this*** coverage litigation to uncover the full scope of the SEC's formal investigation prior to the AXIS policy period.

2003), *aff'd*, 88 F. App'x 441 (2d Cir. 2004). Words and phrases are not to be interpreted in a vacuum. "[T]he [m]ere assertion by one that contract language means something to him [or her], where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." *ABM Mgmt. Corp. v. Harleysville Worcester Ins. Co.*, 112 A.D.3d 763, 764, 977 N.Y.S.2d 330, 332 (2013) (citations and quotations omitted). As such, the Court should analyze the policy provisions as "viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (citation omitted).

The purpose of the policy is critical to a proper interpretation. *See Nat'l Union Fire Ins. Co. v. Stroh Cos.,* 265 F.3d 97, 103 (2d. Cir. 2001) ("[I]nsurance policies . . . are to be construed so as to give effect to the intent of the parties as expressed by their words and purposes.") (internal quotation omitted); *see also McGrail v. Equitable Life Assurance Soc'y,* 292 N.Y. 419, 424, 55 N.E.2d 483, 486 (1944) (insurance policy should not be interpreted so as to "thwart the obvious and clearly expressed purpose which the parties intended to accomplish or where such a construction would lead to an obvious absurdity."). In determining whether coverage is available, the initial burden is on an insured to show that its claim falls within the parameters of a policy's grant of coverage. *See Morgan Stanley Group, Inc. v. New England Ins. Co.,* 225 F.3d 270, 276 (2d Cir. 2000).

Here, there are no material facts in dispute, and the relevant issues of contract interpretation are questions of law that should be decided by the Court on summary judgment. AXIS is entitled to summary judgment as a matter of law because the uncontroverted facts in the

-13-

record, and the plain meaning of both the AXIS and Continental policies, support the conclusion

that the AXIS Policy does not afford coverage to Patriarch on multiple grounds.

>    **B.    AXIS is Entitled to Summary Judgment Because the SEC Investigation Is**
>         **Deemed A Claim "First Made" Prior to the AXIS Policy Period**

As noted, Patriarch as the insured has the threshold burden to provide coverage under the

insuring agreement of the AXIS Policy. Here, that means Patriarch must show that the subject

**"Claim"** was first made during the July 31, 2011 to July 31, 2012 policy period. Where, as here,

it cannot be disputed that the **Claim** was first made before July 31, 2011, Patriarch cannot meet

its fundamental burden of proof, and summary judgment should be granted to AXIS.

The AXIS Policy is a "claims made" policy that only covers claims *first* made during the

AXIS Policy Period. *See* AXIS Policy, Declarations Page ("POLICY APPLIES ONLY TO

CLAIMS FIRST MADE DURING THE **POLICY PERIOD**"). *See generally CheckRite Ltd. v.*

*Ill. Nat'l Ins. Co.*, 95 F. Supp. 2d 180, 191 (S.D.N.Y. 2000) ("The nature of a claims-made

policy is that it protects the insured for claims made against it and reported to the insurer within

the policy period or, if applicable, the extended reporting period").

Because the Continental Policy is the "Followed Policy," it provides the operative

"**Claim**" definition. In this regard, the Continental Policy defines **Claim** to mean among other

things "a written demand for . . . non-monetary relief" or "any administrative or regulatory

proceeding." [Exh. B to Patriarch's Amended Complaint (Dkt. 42-2). The definition of "Claim"

"also includes an **Investigation** of an **Insured** alleging a **Wrongful Act**." *See* Continental

Policy, Section II, Definitions.[6] "**Investigation**" means "a formal civil, criminal, administrative

---

[6]    **Insured** is defined as "the **Insured Person** and **Insured Entity**." Continental Policy, Section II,
       Definitions. **Insured Person** includes any **Executive** or **Employee** of an Insured Entity. *Id*. Executive
       includes "any natural person who was, now is or becomes or is deemed to be a managing director,
       director, [or] officer." *Id*. With respect to an **Insured Person**, **Wrongful Act** is defined to include

or regulatory *investigation or inquiry* by a federal state, local, foreign or offshore governmental authority or self-regulatory organization of an **Insured** in their capacity as such." Furthermore, "**Investigation**" includes, but is not limited to, "*an order of investigation or other investigation by the Securities and Exchange Commission[.]*" *Id.* (emphasis added). An Investigation is "deemed made" when *any Insured* receives "written notice from the investigating authority of an Investigation. Written notice includes, but is not limited to, a *subpoena*, . . . receipt of a *notice of investigation*, *a formal order of investigation*, *SEC Form 1662* . . . or other similar document." Continental Policy, Section VI.D. (emphasis added).

As described above, the SEC entered its Formal Order of Investigation on June 3, 2011. The Formal Order of Investigation plainly constitutes an **Investigation** as defined in the Continental Policy, which by its terms includes "an order of investigation or other investigation by the Securities and Exchange Commission[.]" *See Nat'l Stock Exch. v. Fed. Ins. Co*., No. 06 C 1603, 2007 U.S. Dist. LEXIS 23876, at *10-11 (N.D. Ill. March 30, 2007) (SEC order directing private investigation and designating officers to take testimony was a "formal investigative order" and thus a claim under the policy; such order gave officers the ability to administer oaths, subpoena witnesses, compel witness attendance, and take evidence). The Formal Order of Investigation also constitutes an "administrative or regulatory proceeding" under the applicable SEC regulation. *See* 17 C.F.R. § 203.4 (referring to a "proceeding pursuant to a Commission order for investigation or examination . . . as a *formal investigative proceeding*") (emphasis added).

Courts have found analogous SEC investigations pre-dating claims-made policies precluded from coverage. For example, in *BioChemics, Inc. v. Axis Reinsurance Co*., 83 F. Supp.

---

"*any matter* claimed against such **Insured Person** solely by reason of his or her status as such." *Id.* (emphasis added).

3d 405 (D. Mass. 2015), the SEC commenced a Non-Public Formal Investigation against an insured by formal order dated May 5, 2011 under the caption "In the Matter of BioChemics, Inc. (B-02641)." Pursuant to the formal order, the SEC served document subpoenas on May 9 and September 12, 2011, requesting a wide range of documents regarding the insured. *Id*. at 406. These subpoenas, as the court acknowledged, "indicated the existence of the Formal Order" and were issued under the same caption: "In the Matter of BioChemics, Inc. (B-02641)." After its existing policy expired, the insured purchased a claims-made policy from AXIS, a new insurer to the risk, for the policy period November 13, 2011 to November 13, 2012. In January 2012, after the AXIS Policy came into effect, the SEC served additional deposition subpoenas and document subpoenas, all under the same caption "In the Matter of BioChemics, Inc. (B-02641)" as the 2011 subpoenas. The SEC subsequently filed an enforcement action against the insured in December 2012. *Id.*

In *BioChemics* (as here), the insured notified AXIS of the 2012 subpoenas as an ostensibly "new" claim for coverage, even though the SEC had issued prior subpoenas in the ***same investigation*** before the policy period. Also like the present dispute, AXIS denied coverage, taking the position that the entire SEC investigation and subsequent enforcement action were a single "claim" that was first made in May 2011 prior to the AXIS Policy inception when the SEC issued document subpoenas. The court in *BioChemics* agreed with AXIS, noting that the policy defined "Claim" broadly to include any "civil, arbitration, administrative or regulatory proceeding against any Insured commenced by…the filing of a notice of charge, investigative order, or like document." *Id.* Furthermore, the "triggering events are all part of a ***single SEC Investigation under the Formal Order***. Each subpoena was issued under, and referred to, the original Formal Order, and investigated the same officers and company for the

same pattern of security violations[.]" *Id.* at 407 (emphasis added). The court concluded that, because the Formal Order pre-dated the AXIS policy period, the "investigation and enforcement action, the Claim at issue, was thus 'first made' before the policy period" and not covered by the policy. *Id.* at 408.

*BioChemics* cannot be distinguished from the facts here. Patriarch reported the 2012 Subpoena *it* received pursuant to the Formal Order of Investigation as a **Claim** under the Continental Policy and excess policies, including the AXIS Policy. But the 2012 Subpoena was "part of a single SEC Investigation under the Formal Order," as in *BioChemics*. And it sought to investigate "the same officers and company for the same pattern of securities violations" alleged in the Formal Order of Investigation—which was entered in June 2011. *Id.* at 407. Under the plain terms of the Continental Policy, incorporated into the AXIS Policy, written notice of the SEC Investigation to *any Insured* before the policy period means that the investigation—the **Claim**—is deemed first made before the policy period. Although Patriarch denies receiving a copy of the June 3, 2011 Formal Order of Investigation at the time it was issued, ▮▮▮'s attorney requested, received and reviewed the Formal Order of Investigation on June 13, 2011. Additionally, on July 1, 2011, ▮▮▮ received a subpoena from the SEC as part of the SEC Investigation. ▮▮▮, of course, is an **Insured Person** under the Policy, as Continental acknowledged in its March 7, 2012 coverage correspondence. A and the Continental Policy makes clear that the **Claim** is deemed *first made* when *any Insured* received written notice of the **Investigation**. Furthermore, and in any event, Patriarch received multiple copies of SEC Form 1662, first in December 2009 and once again in late May 2011 (with the latter under the caption of the Formal Order of Investigation). Thus, Patriarch had received written notice of the SEC Investigation before the AXIS policy period. Whereas Patriarch could have looked to its

-17-

prior insurers for coverage—and, indeed, those insurers according to Patriarch have paid their full limits—*AXIS*, the new insurer to the risk, has no obligation under its policy for the **Claim**.

Here, where both Patriarch and at least one other **Insured** unquestionably received written notice of the SEC Investigation before the policy period, the SEC Investigation is not a **Claim** first made during the AXIS policy period. Thus, the SEC investigation and all subsequent proceedings, such as the SEC Enforcement Action, are a single **Claim**[7] made before the policy period and not covered under the AXIS Policy.

### C.    AXIS is Entitled to Summary Judgment Because the Prior or Pending Exclusion Operates Independently to Bar Coverage for Patriarch's Claim

In addition to being a **Claim** first made before the policy period, the SEC Investigation is expressly excluded from coverage under the AXIS Policy's "prior or pending" exclusion.

The AXIS Policy's prior or pending exclusion, Endorsement No. 2, provides that the AXIS Policy shall not apply to any amounts incurred by Patriarch "on account of any claim or other matter based upon, arising out of or attributable to any ***demand, suit or other proceeding*** pending or ***order***, decree, judgment or adjudication entered against any **Insured** on or prior to July 31, 2011, ***or any fact, circumstance or situation underlying or alleged therein***." AXIS Policy (Dkt. 42-1) at Endorsement No. 2 (emphasis added).

Courts, including the Second Circuit, have found such provisions unambiguous and enforceable. *See Weaver v. AXIS Surplus Ins. Co.*, 639 F. App'x 764 (2d Cir. 2016). In *Weaver*, a former executive (Weaver) of an insured entity sued AXIS for coverage under a D&O policy for a criminal investigation and prosecution against him. AXIS denied coverage in part because of

---

[7]    The SEC Investigation and SEC Enforcement Action are **Interrelated Claims** pursuant to Section VI.E. of the Continental Policy. [SOF ¶82]. Accordingly, both the SEC Investigation and the SEC Enforcement Action are deemed first made on the date when the earliest such **Claim** was first made.

its prior or pending exclusion, asserting that Weaver's criminal prosecution involved the same facts and circumstances underlying a November 26, 2007 letter (the "2007 Letter") that the entity received from a Maryland regulatory agency, requesting informal and supposedly "voluntary" responses. Applying nearly ***identical*** policy language to the AXIS Policy here, the Second Circuit upheld the district court's "thorough and well-reasoned opinion" granting summary judgment in AXIS's favor, finding among other things, that the informal and voluntary document requests were excluded from coverage under the AXIS Policy 's prior or pending exclusion, which excluded coverage for "any Claim…in any way involving…any demand, suit or other proceeding pending…against any Insured on or prior to February 20, 2008, or any Wrongful Act, fact, circumstance or situation underlying or alleged therein." *Id.* at 766. The court concluded that the 2007 letter from the regulator, although informal, was a "demand" because it was not "a mere request for information," but rather set forth the agency's authority to seek specific forms of monetary and nonmonetary relief "and threatened more formal legal action in the event that [the insured entity] did not promptly and completely respond." *Id.* at 767.

The SEC Investigation in this case is even more evidently excluded from coverage under the prior or pending exclusion than the informal letter in *Weaver*. Patriarch tendered the 2012 Subpoena to AXIS and other insurers as a **Claim**, and now is seeking coverage for defense costs it allegedly incurred defending against the 2012 Subpoena, later SEC subpoenas as well as the SEC's subsequent, related Enforcement Action. The SEC entered its Formal Order of Investigation against Patriarch on June 3, 2011, pursuant to which the SEC issued at least one subpoena (to ███████) and the 2012 Subpoena to Patriarch. Both subpoenas were issued as part of the formal SEC Investigation. The SEC also sent multiple document demands to Patriarch akin to the voluntary requests in *Weaver* before July 31, 2011, all leading up to the 2012 Subpoena to

Patriarch. Patriarch's defense costs in connection with the SEC Investigation and related

Enforcement Action plainly constitute "amounts incurred by [Patriarch] on account of" a claim

that was "based upon, [arose] out of or attributable to a…. ***demand, suit or other proceeding***

pending or ***order***" entered against Patriarch prior to July 31, 2011—namely the Formal Order of

Investigation and related proceedings and demands (such as the ███ Subpoena)—and

"fact[s], circumstance[s] or situation[s] underlying or alleged therein." The AXIS Policy's prior

or pending exclusion thus precludes such amounts from coverage.

        **D.**    **AXIS is Entitled to Summary Judgment Because the Warranty Executed by Patriarch Bars Coverage**

       The AXIS Policy was issued subject to, and conditioned upon, an express Warranty given

by Patriarch effective as of August 12, 2011. Where, as here, Patriarch on the Warranty date

***already*** was aggressively defending against the SEC Investigation (and paying for three separate

white-collar defense firms to do so), the Warranty is yet another reason why AXIS has no

obligation to cover Patriarch's defense costs defending the SEC Investigation and subsequent

Enforcement Action.

       In the Warranty, Ms. Tilton, on behalf of Patriarch and its directors and officers,

represented that as of August 12, 2011, neither Ms. Tilton nor any other director or officer of

Patriarch was "aware of any facts or circumstances that would reasonably be expected to result

in a Claim" under the AXIS Policy. The Warranty stated that the contents of the Warranty were

"material to the underwriting and acceptance of risk" for the AXIS Policy and that the AXIS

Policy did not "provide coverage for Claims relating to facts or circumstances" that, as of August

12, 2011, Patriarch "was aware of and would reasonably have expected to result in a Claim" covered under the AXIS Policy.[8]

To determine whether an insured has knowledge of facts or circumstances that could reasonably be expected to result in a claim, New York courts apply an objective test: "the appropriate line of inquiry is whether a reasonable person would understand that, given the facts or circumstances, there may be grounds for a claim to be made under the Policy." *XL Specialty Ins. Co. v. Agoglia*, No. 08 Civ. 3821, 2009 U.S. Dist. LEXIS 36601, at *24 (S.D.N.Y. March 2, 2009); *Citak & Citak v. St. Paul Travelers Cos*., No. 07 Civ. 5459, 2008 U.S. Dist. LEXIS 35914, at *6 (S.D.N.Y. April 28, 2008) ("Courts determine whether an insured is on notice of a potential claim using an objective reasonableness standard."). Such inquiry "respects the basic structure of risk distribution in claims-made insurance policies: The insured party with knowledge of potential liability is incentivized—***indeed, required***—to share that knowledge in a sufficiently timely, clear, and comprehensive manner that has agreed to share in the risk of liability." *Univ. of Pittsburgh v. Lexington Ins. Co*.,  No. 13-cv-335, 2016 WL 7174667, at *5 (S.D.N.Y. Dec. 8, 2016) (emphasis added).

A reasonable person in Patriarch's situation as of August 12, 2011 would conclude that the pending SEC Investigation would reasonably lead to a claim under the AXIS Policy. Indeed, ***it already was a Claim*** within the meaning of the Continental Policy. As of August 12, 2011,

---

[8]   The Warranty thus ensured not only that Patriarch was not aware of facts and circumstances that could give rise to a claim—an important underwriting consideration for AXIS, as Patriarch's broker confirmed—but also that any claim arising out of such facts and circumstances would not be covered. Although the Warranty language is clear in itself, AXIS also conveyed its underwriting intent to Patriarch in these terms: "The new limit is not for any existing circumstances." [SOF ¶61]. Patriarch's broker amplified AXIS's concern, advising Patriarch that the Warranty would "eliminate the potential for AXIS to come on the program and be immediately hit with a claim that the client knew was close but hadn't been filed yet."  [*Id.* at ¶55]. In the underwriting process, Patriarch never disagreed with AXIS's position, so clearly stated as it was, and indeed acknowledged that it understood and accepted AXIS's terms. [*Id.* at ¶64].

30134020v7

Patriarch was aware of the extensive nature, indeed, the formal nature, of the SEC Investigation and the SEC's concerns pertaining to Ms. Tilton's management of the Zohar Funds and underlying assets. Indeed, prior to the inception of the AXIS Policy, the SEC had initiated its formal investigation, had requested interviews and documents not only from Patriarch, but also from two former Patriarch employees (for whom Patriarch was paying defense costs) and had called (and held) an hours-long in-person "proffer" meeting in Washington, D.C. with Patriarch's defense counsel. Further, on August 11, 2011, **one day** prior to the Warranty effective date, the SEC informed Patriarch's counsel by e-mail that another formal subpoena was imminent. Specifically, the SEC stated "We will follow this voluntary request with a subpoena." Pursuant to the SEC's demands, Patriarch issued a litigation hold to its employees later the same day—clearly anticipating further battle the SEC.

As such, Patriarch and certain of its officers and directors, including but not limited to Ms. Tilton, were on notice no later than August 12, 2012 that the SEC was aggressively investigating Patriarch and had launched a formal investigation. Accordingly, as of August 12, 2011, Patriarch was aware of facts and circumstances that would reasonably be expected to result in a Claim under the AXIS Policy. In fact, Patriarch knew the 2012 Subpoena—which Patriarch admits is the "claim" at issue in this litigation—was coming and was at least the second subpoena issued by the SEC pursuant to the Formal Order of Investigation. In these circumstances, the Warranty bars coverage for the **Claim** at issue, and AXIS is entitled to final summary judgment in its favor.

## CONCLUSION

For all of the foregoing reasons, AXIS Insurance Company respectfully requests that its

motion for summary judgment be granted.

Dated: January 24, 2017
　　　　New York, NY

TROUTMAN SANDERS LLP

By: ___/s/Gabriela Richeimer_____
John R. Gerstein (admitted *pro hac vice*)
Gabriela Richeimer (admitted *pro hac vice*)
TROUTMAN SANDERS LLP
401 9th Street, NW Suite 1000
Washington, DC 20004
(202) 274-2950
(202) 654-5835 (fax)
john.gerstein@troutmansanders.com
gabriela.richeimer@troutmansanders.com

Matthew J. Aaronson
Susan L. Grace
875 Third Avenue
New York, NY  10022
(212) 704-6006
(212) 704-5901 (fax)
matthew.aaronson@troutmansanders.com
susan.grace@troutmansanders.com

*Attorneys for Defendant AXIS Insurance Company*

30134020v7

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2017, the foregoing document was served in accordance with the Federal Rules of Civil Procedure, by e-mail pursuant to consent, upon the following parties and participants:

TROUTMAN SANDERS LLP

By: _____/s/_____
Gabriela Richeimer

30134020v7