UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                          :
PATRIARCH PARTNERS, LLC,                                  :
                                                          :
                                    Plaintiff,            :
                                                          :          Civil Action No.:
            -vs-                                          :          1:16-CV-2277-VEC
                                                          :
AXIS INSURANCE COMPANY,                                   :
                                                          :
                                    Defendant.            :
                                                          :
-------------------------------------------------------------------X

## AXIS INSURANCE COMPANY'S LOCAL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 56.1, Defendant and Counterclaim Plaintiff AXIS Insurance

Company ("AXIS") submits this statement of undisputed material facts in support of its motion

for summary judgment. AXIS contends that there is no genuine dispute to be tried with respect to

the following material facts:

**General Background**

1.      Patriarch Partners, LLC is a private equity investment firm founded in 2000 by

Lynn Tilton, who serves as Chief Executive Officer. [Dkt. No. 23, Patriarch's Answer to

Defendant AXIS's Counterclaim for Declaratory Relief, ¶ 5].

2.      In the relevant time frame (2011-2012), Patriarch specialized in distressed investing

using structures known as Collateralized Loan Obligations ("CLOs"). [*See generally* Exh. 1,

May 26, 2011 email from S. Blount with "bcc" to multiple insurers].[1]

---

[1]     The abbreviation "Exh." references deposition exhibits by their original designations. All deposition
exhibits are attached in sequential order to the accompanying Declaration of Gabriela Richeimer
("Richeimer Decl."). In addition, any referenced documents not marked in depositions are attached to
the Richeimer Declaration and given letter designations to avoid potential confusion.

30218332v1

3.    "A CLO fund is a securitization vehicle in which a special purpose entity, the issuer, raises capital through the issuance of secured notes and uses the proceeds to purchase a portfolio of commercial loans." [*See* Exh. 94, at ¶15, Order Instituting Proceedings, *In the Matter of Lynn Tilton, et al.*, dated March 30, 2015; Exh. A, Patriarch's Answer dated Apr. 23, 2015, at ¶15].

4.    "A collateral manager, typically an investment adviser, determines what loans to purchase or originate on behalf of the CLO fund." [*Id.*]

5.    "Cash flows and other proceeds from the collateral are used to repay the investor noteholders in the CLO fund." [*Id.*]

6.    The three relevant Patriarch-managed CLOs here are known collectively as the "Zohar Funds," which raised over $1.5 billion from investors and used these investments to make loans to distressed companies." [*See* Exh. 94, at ¶2; Exh. A, at ¶2].

7.    "The Zohar Funds investors invested in the Zohar CLO Funds in return for the promise of regular interest payments and the repayment of their principal on a specified maturity date." [*See* Exh. 94, at ¶16; Exh. A, at ¶16].

8.    Tilton through the Patriarch Collateral Managers for the Zohar Funds "used the funds raised from investors to buy or make loans to primarily private, mid-sized distressed companies" known as the Portfolio Companies. [*See* Exh. 94, at ¶20; Exh. A, at ¶20].

9.    Tilton's management strategy for the Zohar Funds "included improving the operations of the distressed portfolio companies, paying off their debts and increasing their value, and selling businesses." [*See* Exh. A, at ¶22].

10.    Ultimately, the SEC accused Tilton and Patriarch of fraudulently collecting or accruing almost $200 million in management fees and equity distributions from her management of the Zohar Funds. [*See* Exh. 94, at ¶44].

**The SEC Investigation**

11.    Patriarch first learned of the SEC's investigation in December 2009 when it received a letter from the Enforcement Division of the SEC captioned "Re: In the Matter of Patriarch Partners, LLC (HO-11245)." [Exh. 62, December 15, 2009 letter from Christopher Nee to Mark Zucker].

12.    The December 2009 letter from the SEC notified Patriarch that the SEC was conducting an inquiry, sought voluntary production of documents and enclosed a copy of SEC Form 1662, which provides certain instructions, warnings and advice about the recipient's rights and obligations—what Patriarch's SEC counsel called a "statement of rights" in her deposition. [Exh. 62, December 15, 2009 letter from Christopher Nee to Mark Zucker; Exh. B, Brune Deposition, 21:6-12].

13.    Patriarch retained outside counsel from the Brune & Richard law firm, Susan Brune and Hillary Richard (among others), to respond to the SEC on Patriarch's behalf. [Exh. B, Brune Deposition, 19:16-20:20].

14.    Letters from the SEC continued for another 18 months and referred to the matter during that time as an "informal investigation," through which the SEC sought and received additional information from Patriarch about its CLOs including Zohar 2003-1 Ltd., Zohar II 2005-1 and Zohar III, Limited (collectively, the "Zohar Funds"). [Exh. 133, June 28, 2010 letter from Christopher Nee to Susan Brune; Exh. 78, September 15, 2010 letter from Christopher Nee to Susan Brune].

-3-

15.    In a May 27, 2011 letter from the SEC, the SEC issued an extensive set of new document and information requests to Patriarch under the caption, *In the Matter of Patriarch Partners, LLC* (HO-11665), sought to interview a Patriarch employee to explain the company's structure, business and investments and enclosed another Form 1662. [Exh. 84, E-mail to Lynn Tilton from Hillary Richard forwarding May 27, 2011 e-mail and letter from Brent S. Mitchell to Susan E. Brune; Exh. 85, May 31, 2011 and June 1, 2011 emails between the SEC and Brune and Richard regarding interviews and requests].

16.    The SEC issued an Order Directing Private Investigation and Designating Officers to Take Testimony against Patriarch on June 3, 2011—a "Formal Investigatory Proceeding" under the applicable federal regulations (the "Formal Order of Investigation"). *See* 17 C.F.R. § 203.4(a). [Exh. 73, June 3, 2011 SEC Order Directing Private Investigation.]

17.    The Formal Order of Investigation, captioned In the Matter of Patriarch Partners, LLC (HO-11665), authorized certain SEC officers to begin taking formal investigative measures like compelling the production of documents by issuing subpoenas and conducting interviews and taking testimony under oath. [Exh. 73, June 3, 2011 SEC Order Directing Private Investigation.]

18.    Prior to the Formal Order of Investigation, the SEC had no authority to conduct formal proceedings such as subpoenas duces tecum or for live testimony. [Exh. 73, June 3, 2011 SEC Order Directing Private Investigation.]

19.    The Formal Order of Investigation against Patriarch alleges, among other things, that from at least 2000 to June 3, 2011, "certain persons and entities involved in the structuring and marketing of the Patriarch CLOs, directly or indirectly, in the offer or sale or in connection with the purchase or sale of securities including [the Zohar Funds], may have been or may be

-4-

employing devices, schemes, or artifices to defraud, obtaining money or property by means of untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were or are made, not misleading, or engaging in transactions, acts, practices or courses of business which operated . . . as a fraud or deceit upon any person." [Exh. 73 ¶D].

20.   The Formal Order of Investigation states that Patriarch's actions are possible violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities and Exchange Act of 1934 and asserts possible violations of Sections 206(1) and 206(2) of the Advisors Act. [*Id.* & ¶E].

21.   Around the time the Formal Order of Investigation was issued, the SEC contacted two former Patriarch executives, ███████ and ███████ about providing documents and testimony relevant to the Patriarch investigation. [Exh. B, Brune Deposition, 84:16-87:5].

22.   In May 2011, the SEC contacted ███████ about providing an interview, which occurred on July 8, 2011. [Exh. C, Patriarch's Responses to AXIS's Second Set of Requests to Admit, No. 28; Exh. D, September 22, 2011 Invoice from Todd ███████' Counsel reflecting SEC interview on July 8, 2011].

23.   Following this request, ███████ sought indemnification from Patriarch for the fees and costs incurred by his defense counsel (Richard Weinberg of the Morvillo Abramowitz law firm) in responding the SEC's demands, which amounts Patriarch agreed to pay. [Exh. B, Brune Deposition, 84:16-85:2, 42:5-43:4; Exh. C, Patriarch's Responses to AXIS's Second Set of Requests to Admit, Nos. 19, 21, 23].

30218332v1

24.    Patriarch's agreement to indemnify ███████ was formalized in a June 21, 2011 letter from Weinberg to Patriarch, care of Patriarch's counsel Hillary Richard. [Exh. E, June 21, 2011 correspondence from Richard Weinberg to Patriarch Partners, MAGIA 0001-0002].

25.    In June 2011, the SEC contacted the other Patriarch executive, ██████. [Exh. B, Brune Deposition, 84:16-85:2; Exh. C, Patriarch's Responses to AXIS's Second Set of Requests to Admit, Nos. 18, 20, 22].

26.    Pursuant to the Formal Order of Investigation, the SEC issued a formal subpoena to ████ dated July 1, 2011 compelling the production of documents relating to the Zohar Funds by July 22, 2011. [Exh. 130, July 1, 2011 Subpoena issued in the Matter of Patriarch Partners (HO-11665) to ██████ c/o Lindi Beaudreault, Esq.; see also Exh. C, Patriarch's Responses to AXIS's Second Set of Requests to Admit, No. 15].

27.    The ██████ Subpoena identified the relevant matter as the SEC's formal investigation against Patriarch as reflected in the June 3, 2011 Order. [Exh. 130].

28.    The subpoena further sought to take ██████'s testimony under oath to occur in August 2011. [See id.; Patriarch's Responses to AXIS's Second Set of Requests to Admit, No. 32].

29.    Like ██████, ██████ sought indemnification from Patriarch for legal fees incurred in responding to the subpoena and related SEC matters, and Patriarch agreed and paid for ██████ to have defense counsel (Lindi Beaudreault, then at the Shearman & Sterling law firm). [Exh. C, Patriarch's Responses to AXIS's Second Set of Requests to Admit, Nos. 18 and 24; Exh. B, Brune Deposition, 84:16-85:2; Exh. O, SS000013 – SS0000018, June 13, 2011 letter from Lindi Beaudreault to ██████].

30.    Indeed, according to the invoices submitted to Patriarch from counsel, between ███ and ███, Patriarch incurred over ███ in defense expenses by August 12, 2011. [Exh. D, Morvillo Invoices; Exh. F, SS000001-08, September 20, 2011 Shearman & Sterling invoice; Exh.G, Invoice Chart]

31.    ███'s ██████████████████████████████ ██████████████████████. [Exh. F, SS000001-08, September 20, 2011 Shearman & Sterling invoice].

32.    Indeed, as reflected in the invoices sent to and paid by Patriarch, ███'s counsel ██████████████████████████████ ██████████████████████. [Exh. F, SS000001-08, September 20, 2011 Shearman & Sterling invoice]

33.    Patriarch confirmed the formal nature of the SEC proceeding on June 13, 2011—███ ██████████████████████████████. [*Id.*; Exh. H, Patriarch's Supplemental Responses and Objections to Defendant's First Set of Interrogatories dated August 12, 2016, Request No. 5; Exh. 128, Patriarch's Supplemental Responses and Objections to Defendant's First Set of Requests to Admit dated August 12, 2016, Request Nos. 8,9, and 10; Exh. B, Brune Deposition, 84:16-85:2].

34.    In addition, Patriarch's defense counsel Susan Brune, a seasoned white collar attorney with expertise in handling SEC investigations, knew that the SEC could not issue subpoenas without having entered a formal order of investigation. [Exh. B, Brune Dep. 87:19-88:7, 89:22-90:12].

35.    As such, knowing that that the SEC had issued a subpoena to ███ Ms. Brune also knew the SEC investigation had advanced from informal to formal against Patriarch. [*Id.*]

36.    In this time period, Ms. Brune's and Ms. Richard's invoices reflect ████████

███████████████████████████████████████████████████████

███████████████████████. [Exh. 156; July 13, 2011 Brune & Richard invoice;

Exh. 160, August 12, 2011 Brune & Richard invoice].

37.    Even as the SEC had initiated a formal investigatory proceeding against Patriarch

and had issued a formal, mandatory subpoena to one of its former executive, the SEC continued

to seek Patriarch's ostensibly "voluntary" cooperation. [Brune Deposition, 89:13-91:6].

38.    On July 5, 2011, Patriarch's attorneys participated in an all-day, in-person meeting

with members of the SEC enforcement staff in Washington, D.C. to discuss the Zohar Funds and

other matters relating to Patriarch's business—a meeting described by SEC staff as a "proffer."

[Exh. 89, July 5, 2011 Brune & Richard Memorandum regarding the July 5, 2011 SEC meeting;

Exh. 146, August 11, 2011 email from David Elbaum to Lynn Tilton forwarding SEC

communications].

39.    On August 10, 2011, SEC staff spoke with Patriarch's counsel by telephone about

additional information they needed to follow up on the July 5, 2011 proffer meeting and sent an

email a day later confirming this conversation. [Exh. 146].

40.    In an August 11, 2011 email from the SEC to Brune & Richard—forwarded the

same day to Ms. Tilton—the SEC requested Patriarch's continued cooperation in the production

of more Zohar-related documents but warned Patriarch that a formal subpoena to the company

was coming: "We will follow this voluntary request with a subpoena that may seek more

information." [*Id.* (emphasis added)].

41.     The SEC also issued a document preservation request, admonishing Patriarch to preserve "all communications with or about the ratings agencies or the trustees in connection with the Zohar deals." [*Id.*]

42.     Consistent with the SEC's demands to Patriarch, counsel at Brune & Richard drafted, and Patriarch circulated, a litigation hold email to its employees instructing them to retain documents and communications with Patriarch's ratings agencies. [Exh. 147, August 11, 2011 email from Thierry Valat de Cordova].

**Underwriting Process**

43.     On July 5, 2011, Ms. Tilton met in person with Patriarch's insurance broker and underwriters for various insurance companies, including AXIS, interested in potentially quoting primary and/or excess insurance coverage for Patriarch's impending insurance renewal. [Dkt. No. 21, AXIS's Counterclaim for Declaratory Relief, ¶ 14; Dkt. No 23, Patriarch's Answer to AXIS's Counterclaim, at ¶ 14].

44.     Ms. Tilton did not mention to her potential insurers the pending SEC investigation or the contemporaneous proffer meeting between her attorneys at Brune & Richard and the SEC. [Exh. I, Tilton Deposition, 80:25-83:5; Exh. J, Blount Deposition, 161:3-25].

45.     Indeed, at the time when Ms. Tilton and Patriarch were in the process of renewing and increasing the existing D&O coverage, Ms. Tilton had not involved her own in-house attorneys in the SEC investigation. [Exh. K, Schiff Deposition, 25:24-28:11; Exh. L, Gaines Deposition, 85:7-87:7].

46.     Patriarch's Chief Litigation Officer, Carolyn Schiff, generally was responsible for reviewing Patriarch's legal expenses before they were paid, but Ms. Tilton conspicuously shielded Ms. Schiff from reviewing Patriarch's legal bills and those of the indemnified

employees at the same time until Patriarch had secured the renewal policies. [Exh. K, Schiff Deposition, 22:2-24:8]

47.    Patriarch's broker, Stephen Blount from Willis North America, did not tell AXIS about the SEC investigation because Ms. Tilton did not mention or disclose the pending SEC Investigation to him. [Exh. I, Tilton Deposition, 80:25-83:5; Exh. J, Blount Deposition, 161:3-25, 148:21-149:9].

48.    Blount confirmed in his deposition that an SEC investigation is the exact type of pending matter a client should disclose to the broker and carriers. [Exh. J, Blount Deposition, 21:25-23:6; 206:13-207:5].

49.    In the underwriting process, Patriarch's broker suggested that Ms. Tilton "might have disclosed something" at the underwriter meeting and did not want anything disclosed at the meeting to be excluded by the warranty—to which AXIS immediately replied that anything disclosed necessarily **would** be excluded: "Even if Lynn [Tilton] had disclosed something in the meeting there would not be new limit coverage and we don't have a schedule or knowledge of things that "might" have been disclosed in order to specifically exclude them."  [Exh. 52]

50.    Ultimately, Patriarch renewed the expiring $20 million insurance program effective July 30, 2011 for the July 31, 2011 to July 31, 2012 Policy Period with all of the existing insurance carriers. [Dkt. No. 21, AXIS's Counterclaim for Declaratory Relief, ¶ 15; Dkt. No. 23, Patriarch's Answer to AXIS's Counterclaim, ¶ 15].

51.    Then, on August 9, 2011, Patriarch through its broker Willis asked AXIS to quote a new limit of $5 million that would augment the existing insurance program. [Exh. 6, August 9, 2011 e-mails between J. Brendle and R. Clark discussing S. Blount's request for new coverage].

52.     AXIS sent its $5 million excess quote to Patriarch the same day. [Exh. 8, August 9, 2011 e-mail from S. O'Donnell to S. Blount forwarding AXIS quote; Exh. 38, August 9, 2011 e-mail from S. Blount to C. Mercado forwarding AXIS and Hartford quotes].

53.     As reflected in the quote, before AXIS would issue a policy, Patriarch would have to provide a signed and dated warranty statement. [*Id.*]

54.     Further, the AXIS policy would contain several endorsements effective at inception, including "Pending & Prior Claim Date Endorsement- At Inception." [Exh. 8].

55.     As Patriarch's broker explained to Patriarch, AXIS wanted to "eliminate the potential for AXIS to come on the program and be immediately hit with a claim that the claim that the client knew was close but hadn't been filed yet." [Exh. 43, August 12, 2011 e-mail from S. Blount to C. Mercado].

56.     Upon receipt and review of the insurance quotes for the 2011-2012 policy period, as well as Blount's further explanation of coverage, Patriarch agreed to accept AXIS's quotation and requested to "bind" the additional $5 million in coverage from AXIS for a total of $25 million of coverage for the 2011-2012 renewal. [Exh. 120, August 12, 2011 e-mails regarding review of proposals and additional coverage; Exh. M, Mercado Deposition, 20:17-21:13; Exh. 40, August 12, 2011 email from Steve Blount to Sean O'Donnell].

57.     On August 22, 2011, Blount sent Patriarch the binders from the insurers, as well as a draft warranty letter for Patriarch to execute as agreed with AXIS (the "Warranty"). [Exh. 15, August 22, 2011 e-mail from Blount to Mercado].

58.     On August 25, 2011, Patriarch responded to Willis about the draft Warranty, attaching revisions, noting that "given that Lynn (Tilton) may have made some disclosures in the [July 5, 2011] meeting with the underwriters, we'd like to have that point noted in the letter" and

that the purpose of the Warranty is "to tell AXIS we know of no other undisclosed facts." [Exh. 48, August 25, 2011 e-mail from Mercado to Blount].

59.    Willis forwarded Patriarch's comments and edits to AXIS. [Exh. 111].

60.    AXIS disagreed, immediately rejecting Patriarch's proposed changes in a terse email stating that, even if Patriarch had disclosed something in the July 5, 2011 meeting, "there would not be new limit coverage and we don't have a schedule or knowledge of things that 'might' have been disclosed in order to specifically exclude them." [Exh. 112, August 25, 2011 E-mail from R. Clark to S. Blount].

61.    AXIS further stated "since we are simply using our excess policy we want it to be clear in the warranty that **the new limit is not for any existing circumstances**." [*Id*.(emphasis added)].

62.    Upon receiving AXIS's response, Willis accurately conveyed to Patriarch that AXIS did "NOT agree with the proposed warranty letter changes"; that AXIS was not covering circumstances already known at the inception date that might develop into a claim, "regardless if such potential claims were or were not disclosed in the July 5th underwriter meeting"; and that AXIS required the language in the warranty "**to be clear that the new 5x20 limit is not applicable for any existing and known circumstances**." [Exh. 125, August 25, 2011 e-mail from S. Blount to C. Mercado (emphasis in original)].

63.    Willis further explained that AXIS's policy form was "very basic and [AXIS] rel[ies] on the warranty statement as [its] protection against **any such known** situations that might develop into a claim post-inception." [*Id*.]

64.    At that point, Patriarch advised Willis that Patriarch understood AXIS's concerns and believed they could be addressed with some proposed minor changes to the Warranty. [Exh.

97, August 26, 2011 e-mail from C. Mercado to S. Blount; Exh. 53, September 1, 2011 e-mail from S. Blount to C. Mercado].

65.    Among other things, Patriarch ultimately agreed that the Warranty would be effective not on the date the policy went into effect, but when Patriarch and AXIS agreed to the terms of the AXIS policy on August 12, 2011. [Exh. 54, September 6, 2011 email from Steve Blount to Carlos Mercado].

66.    The final Warranty, as executed by Tilton, states that as of August 12, 2011 "neither [she] nor any other director or officer of Patriarch is aware of any facts or circumstances that would reasonably be expected to result in a Claim under the [AXIS] Policy." [Exh. 17, September 9, 2011 e-mail from S. Blount to R. Clark ].

67.    The Warranty also makes coverage unavailable for any claim "relating to facts or circumstances that, as of the date of this letter [August 12, 2011], Patriarch was aware of and would reasonably have expected to result in a Claim covered by [the AXIS] Policy." [*Id.*].

68.    After Patriarch executed the Warranty, AXIS agreed to issue the AXIS Policy, AXIS Excess Policy No. MNN762262/01/2011, effective July 31, 2011 to July 31, 2012 (the "AXIS Policy") [Exh. A to Patriarch's Amended Complaint (Dkt. No. 42-1)].

69.    AXIS issued its final binder on September 15, 2011. [Exh. 57, September 15, 2011 binder].

70.    Once Willis provided AXIS with copies of all underlying insurance policies on March 5, 2012, AXIS immediately issued its new excess policy to Patriarch. [Exh. 20; Exh. N, March 5, AXIS 002092, 2012 e-mail from Steve Blount to Angela Robinson].

71.    As Patriarch's 30(b)(6) witness acknowledged in his deposition, Willis reviewed the AXIS Policy along with the underlying policies and advised Patriarch that the as-issued policies

conformed to the binders. [Exh. M, Mercado Deposition, 51:12-52:21; Exh. 96, March 6, 2012 e-mail from Steve Blount to Carlos Mercado (stating that "the policies comprising Patriarch's 2011-2012 program . . . have been checked for accuracy and comply with the binders")].

**Submission of the SEC Investigation for Coverage**

72.    On or about February 27, 2012, Patriarch received the subpoena it had been expecting from the SEC—a subpoena to Patriarch directly, seeking emails or instant messages from 2008 to the present for Tilton, ███ and ███ (the "2012 Subpoena"). [Exh. 61, February 2012 emails regarding 2012 Subpoena].

73.    The 2012 Subpoena was issued under the same caption as the SEC's May 25, 2011 document requests and later correspondence, the earlier ███ subpoena and the Formal Order of Investigation. [*Id*.].

74.    On or about March 5, 2012, Willis, on behalf of Patriarch, notified AXIS and the other carriers of the 2012 Subpoena. [Exh. 102, March 5, 2012 e-mail from T. Jurusik].

75.    The March 5, 2012 notice was the first time Patriarch or its broker informed AXIS of the SEC investigation. [Dkt. No. 23, Patriarch's Answer to AXIS's Counterclaim, ¶ 28].

76.    On March 7, 2012, Continental promptly acknowledged receipt of the 2012 Subpoena, concluding that all three individuals identified (Tilton, ███ and ███) were "**Insureds**" under the primary Continental Policy and that the 2012 Subpoena was a "**Claim**" within the meaning of the policy insofar as the subpoena "triggered coverage . . . as to all three individuals." [Exh. 138, March 7, 2012 Correspondence from Continental to C. Schiff].

77.    AXIS, for its part, also acknowledged Patriarch's notice of the SEC investigation as a Claim by incorporating Continental's coverage position. [Dkt No. 23, Patriarch's Answer to AXIS's Counterclaim, ¶ 29].

78.    Further, by letter dated October 7, 2013, AXIS reserved its rights on various grounds pending receipt of correspondence between the SEC and Patriarch pertaining to the SEC Investigation. [Exh. 105, October 7, 2013 Correspondence from AXIS to Patriarch; Dkt. No. 23, Patriarch's Answer to AXIS's Counterclaim, ¶ 29].

79.    On March 30, 2015, the SEC filed an administrative enforcement action captioned *In the Matter of Lynn Tilton; Patriarch Partners, LLC; Patriarch Partners, VIII, LLC; Patriarch Partners XIV, LLC; and Patriarch Partners XV, LLC*, Administrative Proceeding File No. 3-16462.

80.    In general terms, the SEC Enforcement Action alleged that Patriarch defrauded the Zohar Funds and their investors in violation of federal securities laws. [Exh. 94, March 30, 2015 Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 and Section 9(b) of the Investment Company Act of 1940, and Notice of Hearing); Dkt. No. 23, Patriarch's Answer to AXIS's Counterclaim, ¶ 31].

81.    The Enforcement Action proceeded to trial in October and November 2016. [Exh. B, Brune Deposition, 137:7-20].

82.    The Enforcement Action and the SEC Investigation are treated as a single claim under the Continental Policy, Section VI.E. [*See* Dkt. No. 23, at ¶3 (defining the subject "claim" to include both the SEC Investigation and Enforcement Action)].

**Policy Language**

83.    The AXIS Policy provides a $5 million aggregate limit of liability excess of $20 million in underlying limits and the applicable retention set forth in the Continental Policy. [Exh. A to Patriarch's Amended Complaint (Dkt. 42-1)].

-15-

84.    The AXIS Policy further states that the AXIS Policy is being issued to Patriarch in consideration of the $47,500 premium paid and "in reliance upon all information and representations provided or made available by the Insureds to the Insurer in connection with the underwriting" of the AXIS Policy (i.e., the Warranty). [*Id*.].

85.    The Continental Policy is designated as the "Followed Policy," meaning  the AXIS Policy generally follows form to the Continental Policy except where the AXIS Policy is different, in which case the AXIS Policy controls. [*Id*.; Exh. J, Blount Deposition 85:14-25; Exh. L, Gaines Deposition 60:2-24].

86.    The Continental Policy is a claims-made policy, and only applies to claims first made against the insured during the policy period. The Continental Policy's Insuring Agreement provides in relevant part:

    2.    <u>Insured Entity Liability</u>

    a.    The Insurer shall pay on behalf of the **Insured Entity** that **Loss** for which the **Insured Entity** has indemnified the **Insured Persons** and which results from any **Claim** first made against the **Insured Persons** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Wrongful Act**.

    b.    The Insurer shall pay on behalf of the **Insured Entity** that **Loss** resulting from any **Claim** first made against an **Insured Entity** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Wrongful Act**.

Continental Policy, Section I(A)(2). [Exh. B to Patriarch's Amended Complaint (Dkt. 42-2)].[2]

87.    **Claim** means among other things "a written demand for . . . non-monetary relief" or "any administrative or regulatory proceeding." [*Id*., Section II, Definitions].

88.     **Claim** also includes an **Investigation** of an **Insured** alleging a **Wrongful Act**. *Id*. **Investigation** means "a formal civil, criminal, administrative or regulatory investigation or inquiry by a federal state, local, foreign offshore governmental authority or self-regulatory

---

[2]    All bolded terms are defined in the Continental Policy.

organization of an **Insured** in their capacity as such and includes, but is not limited to, "an order of investigation or other investigation by the Securities Exchange Commission[.]" [*Id.*].

89.    A **Claim** is "deemed made" with respect to an administrative or regulatory proceeding "on the date of service upon or other receipt by any Insured of a complaint…or similar pleading, demand for arbitration, request for mediation, notice of charges or similar document against an **Insured** in such proceeding or arbitration, request for mediation, notice of charges or similar document against an **Insured** in such proceeding or arbitration, mediation, or other dispute resolution proceeding." [*Id.*, Section IV(D)(2)].

90.    A **Claim** is "deemed made" with respect to an Investigation, "on the date of the receipt by an Insured of a written notice from the investigating authority of an Investigation. Written notice includes, but is not limited to, a ***subpoena***, . . .receipt of a ***notice of investigation***, a formal order of investigation, ***SEC Form 1662*** . . . or other similar document." [*Id.*, Section IV(D)(4) (emphasis added)].

91.    **Insured** is defined as the **Insured Person** and **Insured Entity**. [*Id.*, Section II, Definitions].

92.    **Insured Person** includes any **Executive** or **Employee** of an **Insured Entity**. [*Id.*] Executive includes any natural person who was, now is or becomes or is deemed to be a managing director, director, or officer. [*Id.*]

93.    With respect to an **Insured Person**, **Wrongful Act** is defined to include *"**any matter** claimed against such **Insured Person** solely by reason of his or her status as such." [*Id.* (emphasis added)].

-17-

94.   The Continental Policy contains an Interrelated Claims provision, which provides:

**E.      Interrelated Claims**

More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed to have been first made on the earlier of:

1.      the date on which the earliest such **Claim** was first made, or

2.      the first date valid notice was given by the **Insureds** to the **Insurer** of any **Wrongful Act** or under this or any prior policy of any **Wrongful Act** or any fact, circumstance, situation, event or transaction which underlies any such **Claim**.

[*Id.*, Section VI.E].

95.   The AXIS Policy "APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD[.]" [Exh. A to Patriarch's Amended Complaint (Dkt. 42-1)].

96.   The AXIS Policy's Insuring Agreement provides:

This Policy shall provide insurance excess of the Underlying Insurance. Liability shall attach to the Insurer only after (i) the insurers of the Underlying Insurance, the Insureds or others on behalf of the Insureds shall have paid in legal currency amounts covered under the respective Underlying Insurance equal to the full amount of the Underlying Limit, and (ii) the retention or deductible, if any, applicable under the Underlying Insurance has been satisfied. Except as specifically set forth herein, coverage under this Policy shall apply in conformance with all provisions of the Followed Policy.

[*Id.*, Insuring Agreement].

97.   The AXIS Policy contains a New York Amendatory Endorsement (which serves to ensure that the AXIS Policy conforms with New York insurance law) and an endorsement entitled "Pending and Prior Claims Exclusion Added Endorsement," Form No. XS 11 12 (12 10). [*Id.*, Endorsements Nos. 1 and 2].

98.   The AXIS Policy's prior or pending exclusion, provides as follows:

This Policy shall not apply to any amounts incurred by the Insureds on account of any claim or other matter based upon, arising out of or attributable to any demand, suit or other proceeding pending or order, decree, judgment or adjudication entered against any Insured on or prior to July 31, 2011, or any fact, circumstance or situation underlying or alleged therein.

[*Id.*, Endorsement No 2].


Dated: January 24, 2017


New York, New York

TROUTMAN SANDERS LLP


By: _____ */s/Gabriela Richeimer* _____
John R. Gerstein (admitted *pro hac vice*)
Gabriela Richeimer (admitted *pro hac vice*)
TROUTMAN SANDERS LLP
401 9th Street, NW Suite 1000
Washington, DC 20004
(202) 274-2950
(202) 654-5835 (fax)
john.gerstein@troutmansanders.com
gabriela.richeimer@troutmansanders.com

Matthew J. Aaronson
Susan L. Grace
875 Third Avenue
New York, NY  10022
(212) 704-6006
(212) 704-5901 (fax)
matthew.aaronson@troutmansanders.com
susan.grace@troutmansanders.com

*Attorneys for Defendant AXIS Insurance Company*