```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/22/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
PATRIARCH PARTNERS, LLC,

                          Plaintiff,

                -against-

AXIS INSURANCE COMPANY,

                         Defendant.
-------------------------------------------------------------- X

16-CV-2277 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

      Plaintiff Patriarch Partners, LLC ("Patriarch") was the target of a long-running SEC investigation that culminated in an enforcement action that alleged violations of the Investment Advisers Act of 1940. Having burned through $20 million in primary and excess insurance coverage, Patriarch sought directors' and officers' liability coverage from AXIS Insurance Company ("AXIS"), the last excess carrier on Patriarch's insurance tower. AXIS denied coverage, and Patriarch sued. Pending before the Court are the parties' cross-motions for summary judgment. The heart of the parties' dispute is whether the SEC's investigation into Patriarch is excluded from coverage because it was a pending or prior "claim" at the time the AXIS policy incepted in August 2011. For the reasons that follow, the Court finds that the SEC's investigation is a "prior or pending" "claim" and is, therefore, excluded from coverage. Because this ground is dispositive, the Court does not address AXIS's alternative arguments or Patriarch's cross-motion. AXIS's motion for summary judgment is GRANTED, and Patriarch's motion for summary judgment is DENIED.

**BACKGROUND**

The following facts are either undisputed or, where in doubt, are construed in Patriarch's favor.

**1.    The AXIS Excess Coverage Policy**

Patriarch is a private investment firm led by CEO Lynn Tilton. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement (Dkt. 111) ¶ 1. Beginning in 2009, Patriarch purchased $20 million in professional liability and directors' and officers' insurance from three insurers, Continental Casualty Company ("CNA"), Great American Insurance Company, and Illinois National Insurance Company. Pl.'s Rule 56.1 Statement (Dkt. 98) ¶ 1. Patriarch's coverage tower came up for renewal on July 31, 2011. Pl.'s Rule 56.1 Statement ¶¶ 3-4. In connection with the renewal, Patriarch's insurance broker suggested that Patriarch add a $5 million layer of excess coverage. Pl.'s Rule 56.1 Statement ¶ 21. AXIS quoted the new coverage layer, and Patriarch agreed to purchase it. Pl.'s Rule 56.1 Statement ¶¶ 22, 24-25. The AXIS policy was "bound" on August 12, 2011, subject to the issuance of a complete policy at a later date. Pl.'s Rule 56.1 Statement ¶ 43.

The AXIS policy is what is known as a "follow-form" policy. Except where otherwise specified, the AXIS policy has the same terms and conditions as the CNA policy, which is the primary policy in the coverage tower and is known as the "Followed Policy." Pl.'s Rule 56.1 Statement ¶ 45. Because the AXIS policy does not include a different definition, the definition of "Claim" under the CNA policy applies. Under the CNA policy, a "Claim" is defined to include: "a written demand for monetary damages or non-monetary relief (including but not limited to injunctive relief) or a written request to toll or waive the statute of limitations" or an "Investigation of an Insured alleging a Wrongful Act." Affidavit of Luma Al-Shibib, Esq. ("Al-Shibib Aff.") (Dkt. 103) Ex. 4 PP00003348-94 (the "CNA Policy") at -3352. The term

"Investigation" is defined to include, among other things, "an order of investigation or other investigation by the Securities and Exchange Commission . . . ." CNA Policy at -3555. A "Wrongful Act" is defined as "any actual or alleged error, statement, misstatement, misleading statement, act, omission, neglect or breach of fiduciary or other duty (including, without limitation, any actual or alleged violation of any . . . federal, . . . rule or regulation) committed or attempted, or allegedly committed or attempted, by: [] an Insured Person . . . [or] [] an Insured Entity . . . ." CNA Policy at -3359.

At the time the AXIS policy was "bound," AXIS provided Patriarch with a temporary contract or "Binder" (the "AXIS Binder") summarizing the terms of the coverage.[1] The AXIS Binder includes an endorsement indicating that the AXIS policy will exclude pending and prior claims; it reads: "Pending & Prior Claim Date Endorsement - At Inception." Affidavit of Jennifer Gaines, Esq. (Dkt. 102) Ex. 2 (the "AXIS Binder") at WILLIS00016422. The AXIS Binder did not include the contractual language that would correspond to this endorsement, and neither Patriarch nor its broker asked for it. When the AXIS policy was eventually issued in March 2012 it included an endorsement for "Pending and Prior Claims Exclusion Added." Al-Shibib Aff. Ex. 4 PP00003422-28 (the "AXIS Policy") at -3428. That exclusion provides that the AXIS Policy does not apply to "any amounts incurred by the Insureds on account of any claim or other matter based upon, arising out of or attributable to any demand, suit or other proceeding pending or order, decree, judgment or adjudication entered against any Insured on or prior to July 31, 2011, or any fact, circumstance or situation underlying or alleged therein." AXIS Policy at -3428.

---

[1] An insurance binder is a form of temporary contract. It provides coverage to the insured pending the issuance of a full policy. *See* 1A Couch on Insurance § 13:6 (3d ed.).

## 2. The SEC Investigation

The SEC's investigation of Patriarch began on December 15, 2009, when the SEC requested background information regarding the structure and offering of Patriarch's collateralized debt obligations ("CDOs") and collateralized loan obligations ("CLOs"). Al-Shibib Aff. Ex. 34 at PP00000009. The December 15, 2009, notice described the SEC's request as being in connection with an "informal inquiry." Al-Shibib Aff. Ex. 34 at -0009. After receiving the request, Patriarch hired the law firm Brune & Richard to represent it in connection with the SEC's request. Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶ 13. The SEC followed up with requests for additional documents on June 28, 2010, and September 15, 2010. *See* Al-Shibib Aff. Exs. 35, 36. The June 28, 2010, request sought further information regarding payments from CDOs and CLOs managed by Patriarch and clarification regarding a Patriarch vehicle known as AIP II. Al-Shibib Aff. Ex. 35 at PP00000022-23. The September 15, 2010, request sought further information about AIP II. Al-Shibib Aff. Ex. 36 at PP00003028.

The investigation into Patriarch picked up steam in May 2011. On May 27, 2011, following a telephone call between counsel for Patriarch and the SEC, the SEC sent Patriarch's counsel a detailed request for documents in connection with what it now called an "informal investigation." Al-Shibib Aff. Ex. 37 at PP00000028. For the first time, the May 27, 2011, request explicitly sought documents related to three CLOs, known as the "Zohar funds," which are the subject of the SEC's now-pending enforcement proceeding. *See* Al-Shibib Aff. Ex. 37 at -0029, -0032.

Around the same time, in May and June 2011, the SEC also sought documents from and interviews of two former Patriarch executives, Todd Kaloudis and Meric Topbas. Pl.'s Rule 56.1

Statement ¶¶ 171, 177.[2]  Patriarch agreed to pay for counsel for Kaloudis and Topbas.  Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶¶ 24, 29.  In "early June" 2011, the SEC requested documents from Topbas.  Pl.'s Rule 56.1 Statement ¶ 177.  After discussions with Topbas's counsel, the SEC agreed to subpoena the documents, Pl.'s Rule 56.1 Statement ¶¶ 178-79, which it did via a subpoena to Topbas dated July 1, 2011.  Richeimer Decl. Ex. 130 (the "Topbas Subpoena").  The Topbas Subpoena requested all documents in Topbas's possession regarding the Zohar funds and AIP II and informed the recipient that "federal law requires you to comply with this subpoena."  See Topbas Subpoena.

   The Topbas Subpoena had been issued pursuant to an SEC formal order, dated June 3, 2011, authorizing an investigation of Patriarch.  Al-Shibib Aff. Ex. 38 (the "Formal Order of Investigation").  The Formal Order of Investigation authorized SEC staff to issue subpoenas for testimony and documents, compel production, and take evidence in connection with an investigation into whether Patriarch violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Section 206 of the Investment Advisers Act of 1940.  Formal Order of Investigation at PP00005907-09.  The Formal Order of Investigation states that the SEC has "information that tends to show that" "certain persons and entities involved in the structuring and marketing of the Patriarch CLOs" "may have been or may be" "employing devices, schemes, or artifices to defraud" investors and clients, "[i]n possible violation of" the securities laws.  Formal Order of Investigation at -5907-08.  The Formal Order of Investigation specifically references the Zohar CLOs.  Formal Order of Investigation at -5907-08.  Topbas's counsel received a copy of the Formal Order of Investigation on June 13, 2011,

---

[2] CNA and the other insurers acknowledged that Kaloudis and Topbas are Insureds under the CNA Policy, and Patriarch does not argue otherwise.  See Declaration of Gabriela Richeimer (Dkt. 106) ("Richeimer Decl.") Ex. 138 at AXIS000532; Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶ 76.

and Patriarch's counsel became aware of its existence the same day. Pl.'s Rule 56.1 Statement ¶ 169; Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶¶ 32, 33.

After meeting with Topbas, the SEC scheduled a meeting with Patriarch's attorneys at SEC Headquarters in Washington, D.C., on July 5, 2011, Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶ 38, which was less than a month before Patriarch's insurance tower was renewed. The meeting lasted approximately two and one-half hours. According to a summary of the meeting prepared by Brune & Richard, the SEC discussed with Brune & Richard the AIP II vehicle and the Zohar CLOs. *See* Richeimer Decl. Ex. 89. SEC staff told Patriarch that they would follow up if they had additional questions, which they did by telephone on August 10, 2011. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶ 39. The next day, August 11, 2011 (one day before the AXIS Policy was bound), the SEC sent Patriarch a request for information and documents related to the Zohar CLOs. Al-Shibib Aff. Ex. 39 at PP00003033-34. The SEC's August 11 email described the July 5, 2011 meeting as a "proffer" and stated that the SEC would "follow this voluntary request with a subpoena that may seek more information." Al-Shibib Aff. Ex. 39 at -3034. The SEC also requested that Patriarch "preserve all communications with or about the ratings agencies or the trustees in connection with the Zohar deals." Al-Shibib Aff. Ex. 39 at -3034.

The SEC sent Patriarch a subpoena for documents on February 27, 2012. Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶ 72. Shortly thereafter, on March 5, 2012, Patriarch's broker informed AXIS and Patriarch's other insurers of the SEC investigation. Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶ 74.[3] On March 7, 2012, CNA and the other insurers accepted the subpoena as a covered Claim. Pl.'s Rule 56.1 Statement ¶ 206; Al-Shibib Aff. Ex. 51. AXIS

---

[3] The AXIS Policy was issued on March 5, 2012, hours after Patriarch submitted its claim. Pl.'s Rule 56.1 Statement ¶¶ 77-80.

issued a reservation of rights letter on October 7, 2013. Pl.'s Rule 56.1 Statement ¶ 207. On March 30, 2015, the SEC instituted an administrative and cease-and-desist proceeding against Patriarch. Al-Shibib Aff. Ex. 44. The SEC proceeding alleges that Patriarch concealed the poor performance of the Zohar funds by using dubious and undisclosed valuation methodologies. Al-Shibib Aff. Ex. 44 at PP00000390-91.

After exhausting coverage under the CNA, Great American, and Illinois National policies, Patriarch demanded that AXIS assume a defense of the SEC Investigation. Pl.'s Rule 56.1 Statement ¶ 210. AXIS denied coverage on September 11, 2015, Pl.'s Rule 56.1 Statement ¶ 213, and this lawsuit followed, Compl. (Dkt. 1). The parties have cross-moved for summary judgment. Dkts. 70 (Patriarch), 75 (AXIS).

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted)). Courts "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79-80 (2d Cir. 2009) (alterations omitted)).

New York law governs the AXIS Policy. "New York insurance law provides that 'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'" *Parks Real Estate Purchasing Grp. v. St. Paul Fire and Marine Ins.*

*Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Morgan Stanley Grp., Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)). "The initial interpretation of a[n] [insurance] contract 'is a matter of law for the court to decide.'" *Morgan Stanley Grp., Inc.*, 225 F.3d at 275 (quoting *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)). Because an exclusion negates coverage, it must be stated in "clear and unmistakable language." *Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y.*, 671 N.Y.S.2d 66, 71 (1st Dep't 1998). As such, in construing an exclusion, the Court must resolve any ambiguities in favor of the insured. *See Parks Real Estate Purchasing Grp.*, 472 F.3d at 42-43 ("if the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer" (quoting *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 788 N.Y.S. 2d 142, 144 (2d Dep't 2004))).

**1.      The Pending and Prior Claim Exclusion**

Because Patriarch filed its claim before the AXIS Policy was issued, the AXIS Binder is the parties' controlling agreement. *See* Pl.'s Mem. (Dkt. 80) at 18; *see also In re Sept. 11th Liab. Ins. Coverage Cases*, 458 F. Supp. 2d 104, 115 (S.D.N.Y. 2006). Binders are not integrated agreements, and the parties dispute how the pending and prior claims endorsement included in the Binder should be interpreted. *See World Trade Ctr. Prop., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003) ("it is just as well settled in New York that extrinsic evidence is admissible to determine the parties' intentions with respect to the incomplete and unintegrated terms of a binder"). It is AXIS's position that the parties' intent is reflected in the AXIS Policy's exclusion for "any claim or other matter based upon, or arising out of or attributable to any demand, suit or other proceeding pending . . . against any Insured on or prior to July 31, 2011 . . . ." *See* Def.'s Opp'n (Dkt. 115) at 14-16. Patriarch, on the other hand, argues that a more

limited exclusion for pending and prior "Claims" was intended. *See* Pl.'s Sur-Reply (Dkt. 138) at 1.

For purposes of summary judgment – and consistent with New York law's requirement that exclusions be interpreted narrowly – the Court adopts Patriarch's proposed reading of the pending and prior claims endorsement. Under that reading, the parties' agreement was to exclude from coverage any "Claim," as defined by the CNA Policy, that was pending or existed against Patriarch at the time the AXIS policy incepted on August 11, 2011. *See* Pl.'s Sur-Reply at 1 ("the parties intended the pending and prior claims exclusion to exclude any 'Claim' . . . that was pending as of, or asserted prior to, the AXIS Policy inception date"). The critical question then becomes when the SEC investigation became a "Claim."

**2.     The Topbas Subpoena, the Formal Order of Investigation, and the SEC's Underlying Investigation Constitute a Pending or Prior "Claim"**

Analyzed separately or collectively, the Topbas Subpoena, the Formal Order of Investigation, and the SEC's underlying investigation of Patriarch constitute a "Claim" against an Insured that was pending before August 11, 2011.

The Topbas Subpoena constitutes a "demand" for "non-monetary relief" under the CNA Policy. Although the CNA Policy does not define the term "demand," the Second Circuit has explained that a demand is an "imperative solicitation for that which is legally owed." *Gil Enter., Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996). A subpoena from the SEC is such an imperative solicitation: "an SEC subpoena is not a mere request for information, but a substantial demand for compliance by a federal agency with the ability to enforce its demand." *Minuteman Int'l, Inc. v. Great Am. Ins. Co.*, No. 03 C 6067, 2004 WL 603482, at *7 (N.D. Ill. Mar. 22, 2004); *see also Weaver v. Axis Surplus Ins. Co.*, 639 F. App'x 764, 766-67 (2d Cir. 2016) (concluding that a letter was a "demand" because it "set forth the division's

9

request under a claim of right, including its entitlement to the documents identified therein, and put [the recipient] on notice of the legal consequences"). The Topbas Subpoena also sought "non-monetary relief" in the form of the documents that were to be produced. Numerous courts have considered this issue and concluded that the plain meaning of "non-monetary relief" includes the production of documents. *See Minuteman Int'l Inc.*, 2004 WL 603482, at *7 ("Just as being required to produce documents or provide testimony would be relief in a court proceeding seeking enforcement of an SEC subpoena, the relief sought by the subpoena itself is the production of documents or testimony."); *see also Morden v. XL Specialty Ins.,* 177 F. Supp. 3d 1320, 1330 (D. Utah 2016) (holding same); *cf. Polychron v. Crum & Forster Ins. Cos.*, 916 F.2d 461, 463 (8th Cir. 1990) ("The defendants' characterization of the grand-jury investigation as mere requests for information and an explanation underestimates the seriousness of such a probe. As later events proved, the plaintiff was the target of the investigation.").

Patriarch's attempts to minimize the significance of the subpoena served on Topbas are unpersuasive. The fact that Topbas's counsel requested a subpoena before providing documents to the SEC does not make Topbas's compliance with the subpoena "voluntary," as Patriarch argues. Common sense suggests and the record confirms that Topbas's counsel sought the subpoena so that Topbas would not be in the potentially awkward position of voluntarily providing information to the SEC regarding his former employer, who was paying for his attorney. *See* Affidavit of Lindi Beaudreault, Esq. (Dkt. 100) ¶ 6 (Topbas asked the SEC to send a subpoena, "explaining that Patriarch company documents would be more appropriately provided from a former employee in response to formal process."). More important, the subpoena itself makes quite clear that compliance is not optional and that failure to produce the requested documents would trigger penalties under federal law. *See* Richeimer Decl. Ex. 130.

Patriarch also relies heavily on *Diamond Glass Cos. v. Twin City Fire Insurance. Co.*, which held that a grand jury subpoena did not seek "relief," as the court understood that term. No. 06-CV-13105 (BSJ), 2008 WL 4613170, at *4 (S.D.N.Y. Aug. 18, 2008). In the context of that case, the court concluded that the parties did not intend for coverage to apply to a subpoena when there was no assertion of civil or criminal liability against the insured. *See id.* (interpreting "demand for non-monetary relief" to cover a subpoena for documents would require insurers to hold "insureds harmless from costs associated with any participation in the legal system"). Had the parties in this case intended to exclude a subpoena where there was no assertion of civil or criminal liability from the definition of a "Claim," they could have done so by limiting coverage to demands for non-monetary relief that allege a "Wrongful Act." It is significant that the CNA Policy contains precisely that limitation with respect to coverage of "Investigations" but does not include any similar limit in coverage for "demands" for "non-monetary relief."[4] In the context of the CNA Policy, the Court finds that "non-monetary relief" includes a subpoena for documents.

The Formal Order of Investigation and the SEC's underlying investigation of Patriarch are also "Claims" within the meaning of the CNA Policy. The CNA Policy provides that a "Claim" includes an "Investigation" of "an Insured" alleging a "Wrongful Act." The definition of an "Investigation" explicitly references "an order of investigation or other investigation by the Securities and Exchange Commission." CNA Policy at -3355. The Formal Order of Investigation was directed at an "Insured," namely, Patriarch. *See* Formal Order of Investigation at -5907. The Formal Order of Investigation also alleges a "Wrongful Act" because the Order states that the SEC has information that "tends to show" that Patriarch "may have been or may

---

[4] Even were the term "non-monetary relief" ambiguous, which courts have consistently found it is not, the Court would construe the term (and the definition of a "Claim") broadly so as to favor coverage under the Policy. *See Randolph v. Nationwide Mut. Fire Ins. Co.*, 662 N.Y.S.2d 650, 651 (4th Dep't 1997) ("In issues of insurance coverage, any ambiguities are construed in favor of coverage"). *Diamond Glass* is contrary to this basic principle, and the Court declines to follow it.

11

be" defrauding its clients and investors "[i]n possible violation" of the securities laws.  Formal Order of Investigation at -5907.  This statement amounts to a declaration that the SEC is investigating an allegation of wrongdoing, albeit in the somewhat stilted language of the federal bureaucracy discussing an ongoing investigation.  *Weaver v. Axis Surplus Ins. Co.*, No. 13-CV-7374 (SJF), 2014 WL 5500667 at *12 (E.D.N.Y. Oct. 30, 2014), *aff'd,* 639 F. App'x 764 (2d Cir. 2016) (holding that state attorney general's letter that insured "may be" violating state law constitutes an "allegation" of a "wrongful act"); *Nat'l Stock Exch. v. Fed. Ins. Co.*, No. 06 C 1603, 2007 WL 1030293, at *5 (N.D. Ill. Mar. 30, 2007) (concluding that a materially identical SEC order of investigation alleged a wrongful act because the term "allegedly" "necessarily includes acts that *may have been* committed"); *Morden*, 177 F. Supp. 3d at 1330 (relying in part on a materially similar SEC order of investigation to conclude that there was an allegation of a wrongful act).

The escalating seriousness of the SEC's inquiry at the time the Formal Order was issued further supports the Court's conclusion that the SEC was investigating an alleged "Wrongful Act."  The Formal Order of Investigation marked a bright line in the SEC's inquiry, which had moved from informal requests for information to a targeted investigation of Patriarch, focusing on three CLOs, using formal legal process, including subpoenas, to compel testimony and documents from Patriarch and former Patriarch executives.  Al-Shibib Aff. Ex. 38.  By the time the AXIS policy was bound on August 11, 2011, the SEC staff had met with Patriarch, interviewed Topbas and Kaloudis, obtained the Formal Order of Investigation, served a subpoena pursuant to a Formal Order on Topbas, and informed Patriarch's counsel that a subpoena for documents from Patriarch was coming.  Pl.'s Rule 56.1 Statement ¶¶ 173, 177, 183.  And,

Patriarch submitted that subpoena – promised in August 2011 and issued in February 2012 pursuant to the same order of investigation – as a Claim under the CNA Policy.[5]

Relying on out-of-circuit authority, Patriarch argues that the Formal Order of Investigation did not "allege" a "Wrongful Act" because it did not constitute an accusation by the SEC that Patriarch had committed fraud.  *See* Pl.'s Opp'n at 18.  The cases cited by Patriarch are based on a crabbed interpretation of the word "allege" and involve materially different policy language.  In the leading case, *Employers' Fire Insurance Co. v. ProMedica Health Systems*, the Sixth Circuit concluded that an order of investigation from the Federal Trade Commission ("FTC") did not "allege" a violation of the antitrust laws, and, therefore, was not a proceeding "for a Wrongful Act;" the FTC's order stated that the FTC sought "to determine whether" the insured's conduct violated the Clayton Act.  524 F. App'x 241, 243, 247-48 (6th Cir. 2013).  For support, the Sixth Circuit relied on the definition of "allege" as to "assert to be true" or "declare" a fact.  *Id.* at 247 (citing *Allege*, Black's Law Dictionary (9th ed. 2009)).  Unlike the CNA Policy, the policy at issue in *ProMedica* did not provide coverage for "investigations," and the specific question presented to the *ProMedica* court was whether the FTC's order amounted to an administrative "proceeding for monetary, non-monetary or injunctive relief commenced by: . . . [] the filing of a notice of charges, formal investigative order or similar document, against an Insured for a Wrongful Act."  *Id.* at 243.  Fairly read, that policy intends to provide coverage only at the point when the insured has been charged with wrongdoing.

---

[5] The Second Circuit's decision in *MBIA v. Federal Insurance Co.* is not directly on point, but it is consistent with this Court's holding.  *See* 652 F.3d 152 (2d Cir. 2011).  In that case the Second Circuit concluded that a subpoena was the "outward-facing form" of an investigation by the New York Attorney General.  *Id.* at 159.  Similarly, the Formal Order of Investigation is the formal approval of the SEC Commission for its staff to conduct an investigation of Patriarch.  The Formal Order of Investigation indicates that the Commission concluded that its staff had gathered enough evidence to warrant further investigation of "alleged" wrongdoing by Patriarch through the use of compulsory process.

However appropriate *vel non* the Sixth Circuit's definition of "allege" may be in the context of the policy at issue in *ProMedica*, it is inapposite relative to a policy that expressly covers "Investigations," like the CNA Policy. This Court finds more relevant the commonsense meaning of the term "allege" applied in *National Stock Exchange* and by the Eastern District of New York in *Weaver*. Under that definition, "[w]here a 'Wrongful Act' is defined to include acts 'allegedly' committed, 'the scope of the term necessarily includes acts that *may have been* committed.'" *Weaver*, 2014 WL 5500667, at *12 (quoting *Nat'l Stock Exch.*, 2007 WL 1030293, at *5).

Patriarch strains to read several other qualifications into the definition of "Claim," none of which is supported by the text of the CNA Policy. There is no requirement, as Patriarch suggests, that the SEC's order of investigation be delivered specifically to Patriarch, and Patriarch cites no provision of the Policy or case law that supports its argument that there is such a requirement. *See* Pl.'s Opp'n at 18.[6] Similarly, the CNA Policy does not require that the order of investigation be delivered to the same insured as against whom the Wrongful Act is alleged. Pl.'s Opp'n at 18. Rather, the Policy requires that there be an "investigation" into *an* "Insured" – here Patriarch – alleging a Wrongful Act. Finally, the Formal Order of Investigation was undisputedly delivered to an Insured under the CNA Policy, namely, Topbas.

In sum, even if the Court accepts Patriarch's proposed interpretation of the pending and prior claims exclusion in the AXIS Binder, the SEC investigation was a "Claim" that was pending prior to the inception of the AXIS policy and is therefore excluded from coverage.[7]

---

[6] Patriarch's argument on this point might resonate more if Patriarch had been unaware that a Formal Order existed, but there is no question that Patriarch's lawyers learned of the Formal Order well before the AXIS policy was bound. Pl.'s Rule 56.1 Statement ¶ 169; Pl.'s Resp. to Def.'s Rule 56.1 Statement ¶¶ 32, 33.

[7] The Court rejects Patriarch's hail-Mary attempt to read the "interrelated claims" provision out of the CNA Policy. An AXIS modification to the CNA Policy's notice provision incorrectly cross-referenced the "interrelated claims" provision of the CNA Policy (Section IV, paragraph E) rather than the notice provision (Section IV,

## CONCLUSION

AXIS's motion for summary judgment is GRANTED. Patriarch's motion for summary judgment is DENIED. The Clerk of the Court is directed to close the open motions at docket entries 70, 75, 96, and 104; to enter judgment in favor of AXIS; and to terminate this case.

**SO ORDERED.**

Date:  September 22, 2017
         New York, New York

_____
**VALERIE CAPRONI**
**United States District Judge**

---

paragraph F). Were this to have been intentional, the AXIS Policy would have two substantively similar and sequential notice provisions and the policy's other references to "interrelated claims" would be meaningless.