**MANDATE**

17-3022
Patriarch Partners, LLC v. Axis Insurance Company

N.Y.S.D. Case #
16-cv-2277(VEC)

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 6th day of December, two thousand eighteen.

PRESENT:
> JON O. NEWMAN,
> SUSAN L. CARNEY,
> > *Circuit Judges*,
> RICHARD J. SULLIVAN,
> > *District Judge.*\*

───────────────────────────────────────

PATRIARCH PARTNERS, LLC,

> *Plaintiff–Counter-Defendant–Appellant*,

v.                                      No. 17-3022

AXIS INSURANCE COMPANY,

> *Defendant–Counter-Claimant–Counter-Defendant–Appellee.*

───────────────────────────────────────

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan 14 2019

───

\* Judge Richard J. Sullivan, of the United States District Court for the Southern District of New York, sitting by designation.

MANDATE ISSUED ON 01/14/2019

| | |
|---|---|
| FOR APPELLANT: | FINLEY T. HARCKHAM, (Luma S. Al-Shibib *on the brief*) Anderson Kill, P.C., New York, NY. |
| FOR APPELLEE: | JOHN R. GERSTEIN, (Gabriela Richeimer, Elizabeth Jewell *on the brief*), Clyde & Co US LLP, Washington, D.C. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Caproni, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on September 25, 2017, is **AFFIRMED**.

Plaintiff-Appellant Patriarch Partners, LLC ("Patriarch") appeals from a judgment entered in the United States District Court for the Southern District of New York (Caproni, *J.*), granting summary judgment under Federal Rule of Civil Procedure 56 in favor of Defendant-Appellee Axis Insurance Company ("Axis") on Patriarch's claims for breach of contract and declaratory relief. The central question presented to the District Court and on appeal is whether a lengthy Securities and Exchange Commission ("SEC") investigation into Patriarch ripened into a "claim" before the Axis insurance policy inception date, thereby excluding related defense costs from coverage under the terms of the policy and a related warranty provided by Patriarch to Axis. In an opinion resolving cross-motions for summary judgment, the District Court ruled that coverage was excluded under the Axis policy's "prior or pending claims" endorsement. We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to affirm the District Court's decision in Axis's favor. Because we conclude that Patriarch's claims are foreclosed by the language of the warranty statement signed by its only officer, we need not reach the grounds relied on by the District Court. *See Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) (court of appeals may affirm district court decision on any ground supported by record).

2

We review *de novo* a district court's decision to grant summary judgment. *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). Summary judgment may be awarded only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Unless otherwise noted, the facts below are either undisputed, or the objecting party has not pointed to any contradictory evidence in the record. On review of an award of summary judgment, "all factual inferences must be drawn in favor of the non-moving party." *Miller*, 321 F.3d at 300. In this case, that party is Patriarch.

I.

Patriarch is a private equity investment firm that, among other things, bundles distressed loans to sell to investors as Collateralized Loan Obligations ("CLOs"). Patriarch employs numerous professionals, but Lynn Tilton ("Tilton") is Patriarch's founder, sole director, and sole officer.

In December 2009, the SEC sent Patriarch a letter captioned "In the Matter of Patriarch Partners LLC (HO-11245)," notifying the company that the SEC was conducting an "informal inquiry" into the company and requesting that Patriarch voluntarily provide information and produce documents. App'x at 490. The December 2009 letter, addressed to Patriarch's chief administrative officer, was accompanied by an SEC Form 1662—a standard agency form that provides information on the rights of persons subject to voluntary or mandatory information requests. Advised by Susan Brune of Brune & Richard, LLP— outside counsel retained in connection with the SEC inquiry—Patriarch voluntarily complied with the December 2009 request, as well as with follow-up requests received by it in June and September 2010.

One and one-half years later, by letter dated May 27, 2011, and addressed to Brune, the SEC again contacted Patriarch. The letter, this time captioned "In the Matter of Patriarch Partners, HO-11665," described the SEC proceeding as an "informal investigation," as opposed to the earlier "inquiry." Like the December 2009 letter, the May 2011 letter enclosed a Form 1662. In the May 2011 letter, the SEC requested extensive information and documents relating to Patriarch's organization and business practices. It

3

also requested information about particular "Patriarch Structures," which the agency defined to include any CLO that Patriarch had provided investment advice on from 2002 until the date of the letter, and certain other funds marketed by Patriarch, including the "Zohar" CLOs. App'x at 507.

On June 3, 2011, the SEC internally issued an "Order Directing Private Investigation and Designating Officers to Take Testimony" (the "Order of Investigation" or "Order") against Patriarch.[1] It bore the same caption as the May 2011 letter. The Order of Investigation authorized certain SEC enforcement officers for the first time to issue subpoenas and take sworn testimony under oath in the Patriarch matter. The Order stated that "[t]he Commission has information that tends to show" that Patriarch had acted in "possible violation" of the Securities Act of 1933 and the Securities and Exchange Act of 1934 in the "structuring and marketing" of certain Patriarch CLOs—largely the same CLOs that had been the subject of the May 27, 2011 information request. App'x at 519-520. The Order was not published or publicly available. Although Patriarch maintains that it did not see a copy of the Order until October 2012, Patriarch concedes that Brune, its outside counsel, "became aware" of the Order on June 13, 2011. App'x at 1980.

Also in or about June 2011, the SEC requested interviews with two former Patriarch executives, Todd Kaloudis and Meric Topbas. Kaloudis and Topbas each retained counsel for assistance in responding to the SEC requests. In June and July of 2011, they turned to Patriarch for indemnification of their legal expenses, and Patriarch agreed to their requests.

In addition to an interview, the SEC requested that Topbas produce documents created during his employment with Patriarch. On June 13, 2011, Topbas's counsel requested a copy of the Order of Investigation from the SEC and reviewed it before

---

[1] The SEC refers to such orders as "Formal Orders of Investigation" or "formal orders." SEC Division of Enforcement, Enforcement Manual, 2.3.3 (November 28, 2017). Under the Enforcement Manual, Division Directors at the SEC may issue formal orders when, in their discretion, they believe that a formal investigation is necessary to determine whether a violation of federal securities laws has occurred. *Id.* at 2.3.4 Formal orders generally describe the nature of the investigation and identify the specific staff officers authorized to subpoena witnesses, administer oaths, and otherwise compel the production of evidence. *Id.*

4

contacting Patriarch's outside counsel the next day. Topbas eventually submitted to the interview without demanding a subpoena, but his counsel took the position with the SEC that the documents would be "more appropriately provided" in response to a subpoena. App'x at 1661. On July 1, invoking its authority under the Order, the SEC issued a formal subpoena to Topbas (the "Topbas Subpoena"). The Topbas Subpoena bore the same caption as the May 2011 letter and the Order.

On July 5, 2011, Patriarch's outside counsel (Brune and other Brune & Richard attorneys) met with SEC officials in Washington, D.C., and provided information on Patriarch's structure, operations, and certain of its CLOs. On August 11, an SEC officer who had attended the July meeting emailed Brune requesting, among other things, extensive information and documents related to the "Zohar" CLOs. In the email, the SEC officer referred to the July 5 meeting as a "proffer" and asked the firm to respond to certain substantive questions that had been raised at that meeting about the "Ark" and "Zohar" CLOs. Notably, the email also advised that the SEC "*will follow* this voluntary request with a subpoena that may seek more information," and directed Patriarch to preserve certain communications. App'x at 1917-19 (emphasis added). Brune's associate forwarded this email to Tilton within an hour of receiving it, and Tilton responded minutes later. That evening, Patriarch's chief compliance officer sent out an office-wide "Retention Policy Reminder," directing employees to retain certain of their communications and documents.

Meanwhile, Patriarch was in the process of renewing its directors and officers (D&O) professional liability insurance portfolio. Its existing policies expired and were renewed annually on or about July 31. In previous years, Patriarch had maintained a "tower" of D&O insurance comprised of several policies totaling $20 million in policy limits. As of June 2011, the existing tower consisted of (1) a primary policy with a $10 million limit issued by Continental Casualty Company (the "CNA Policy"), (2) a $5 million first-level excess policy issued by the Great American Insurance Company, and (3) a $5 million second-level excess policy issued by Illinois National Insurance Company.

5

On August 9,[2] Patriarch's insurance broker, Steve Blount, recommended to Patriarch that it purchase a third excess layer of $5 million, extending Patriarch's policy limit to $25 million. The same day, Axis gave Blount a quote for a third $5 million excess layer. Patriarch accepted the Axis quote on August 12, at which point the Axis Policy became "bound."[3] Coverage under the Axis Policy was made effective as of July 31. The Axis Policy, like the other two excess policies, was a "follow-form" policy that rested on the CNA Policy. According to industry practice, this meant that the excess policies adopted the terms of the primary CNA Policy, except as modified by certain "endorsements."

Following the terms of the CNA Policy, the policies in Patriarch's insurance tower—including Axis—provided coverage for "any Claim first made against an Insured . . . during the Policy Period." App'x at 181. The policies defined a "Claim" to include, among other things, "an Investigation of an Insured alleging a Wrongful Act." *Id.* at 183. An "Investigation" was defined to include "a formal . . . regulatory investigation or inquiry," including specifically "an order of investigation or other investigation by the [SEC]." *Id.* at 186.

In August, before Patriarch accepted the Axis quote, Blount notified Patriarch's insurance team that Axis had made its quote contingent upon Patriarch's execution of a warranty statement (the "Warranty"). Blount wrote in an email dated August 12 that Axis intended the Warranty to "eliminate the potential for Axis to come on the program and be immediately hit with a claim that the client knew was close but hadn't been filed yet." App'x at 847. Patriarch and Axis negotiated the text of the Warranty between approximately

---

[2] Although the 2010-2011 policies were due to expire on July 31, they were briefly extended and the negotiations over quotes for the 2011-2012 policy period occurred in early August. All D&O policies for the 2011-2012 policy period were retroactively made effective as of July 31, 2011.

[3] The Axis policy was "bound" through the execution of policy "binders," which Blount forwarded from Axis to Patriarch on August 22. Binders are temporary, unintegrated insurance contracts that provide coverage to the insured pending the issuance of a full policy. *See* 1A Couch on Insurance § 13:6 (3d ed.). For reasons that the parties dispute and that are unclear from the record, the full Axis Policy was not issued until March 2012. Whether the Axis binders differed in substance from the full Axis Policy presented an important and disputed issue in the District Court decision. Because we decide this case on different grounds, however, we do not elaborate on any potential distinctions here.

6

August 22 and September 9. Axis received an executed copy of the Warranty on the latter date. At Patriarch's request the Warranty was dated August 12, 2011.

> Signed by Tilton, the Warranty provided as follows:
>> This letter is provided pursuant to a request by Axis Insurance Company ("Insurer"). The information contained herein applies only to the captioned policies to be provided to the Insureds by the Insurer. It is understood and agreed that this letter is and shall be deemed to be submitted to the Insurer and material to the underwriting and acceptance of risk for the Captioned Policy.
>>
>> The undersigned, on behalf of Patriarch and all of its directors and officers, hereby represents that as of the date of this letter *neither the undersigned nor any other director or officer of Patriarch is aware of any facts or circumstances that would reasonably be expected to result in a Claim under the Captioned Policy.* It is understood that the Captioned Policy and any renewal thereof does not provide coverage for Claims relating to facts or circumstances that, as of the date of this letter, Patriarch was aware of and would reasonably have expected to result in a *Claim covered by such Captioned Policy* (or future renewal thereof).
>>
>> By executing this letter, I confirm that I understand that the Insurer is relying upon this warranty in order to incept the proposed coverage.

App'x at 131 (emphasis added). The Warranty header defined the "Captioned Policy" as "Axis Excess Policy No. MNN762262/01/2011 ($5mm limit excess $20mm)."

On February 27, 2012, just over six months after the Axis Policy became effective, the SEC served the subpoena that it had advised Patriarch in August would be forthcoming (the "Patriarch Subpoena"). The Patriarch Subpoena was issued under the same SEC numbered caption as the May 27, 2011 letter, the Order of Investigation, and the Topbas Subpoena: "In the Matter of Patriarch Partners (HO-11665)." It required Patriarch to produce all emails or instant messages from Tilton, Kaloudis, and Topbas from January 1, 2008, through the subpoena's date.

On March 5, 2012, in a letter to all of its D&O insurers, Patriarch tendered notice of the Patriarch Subpoena as a "new matter." CNA responded to Patriarch in a letter dated March 7, 2012, that Patriarch Subpoena "appears to qualify as a 'Claim' for a 'Wrongful

7

Case 16-3022, Document 142, 01/14/2019, 2464019, Page 8 of 12
Case 1:15-cv-02277-VEC Document 420 Filed 01/14/19 Page 8 of 12

Act.'" App'x at 1027. Axis also acknowledged Patriarch's notice of the SEC investigation as a Claim but, in a letter dated October 7, 2013, expressly reserved its rights to deny coverage under the Axis Policy.

In March 2015, more than three years after it issued the Patriarch subpoena, the SEC filed an administrative enforcement action against Patriarch. In the intervening years, the costs of defending the SEC proceeding had depleted nearly all of Patriarch's underlying $20 million in D&O coverage. In August 2015, Patriarch notified Axis that it had exhausted its underlying policy limits, and asked Axis to assume the obligation to cover defense costs. Axis denied coverage on the basis (among others) that the SEC investigation was not a Claim "first made" against Patriarch during the Axis Policy period, because the investigation had begun before the policy inception date of July 31, 2011. This lawsuit followed.

Following extensive discovery at the District Court, the parties filed cross-motions for summary judgment. Axis argued that it was excused from coverage on at least two bases: First, that the SEC investigation was a "Claim" first made before the Axis policy incepted and was therefore not covered by the Axis Policy; second, that the Warranty relieved Axis of its obligations because the SEC investigation constituted "facts or circumstances" of which Patriarch was aware that could reasonably have been expected to result in the Claim.

In a thorough opinion, the District Court ruled that the SEC investigation was a "Claim" that was "pending prior to the inception of the Axis policy," and was therefore excluded under the binder's "pending or prior claim" endorsement. Because this ground was dispositive, the District Court did not address Axis's alternative arguments or Patriarch's cross-motion.

Patriarch timely appealed.

II.

Patriarch concedes that the Warranty effects an exclusion from coverage but disputes that it excluded coverage for the SEC investigation Claim. Patriarch makes two arguments against applying the Warranty exclusion. First, it argues that the Warranty excluded coverage

8

only for Claims relating to facts or circumstances of which Tilton herself was aware as of August 12, since Tilton was the sole officer or director of Patriarch. Tilton made sworn statements that she was not aware of the Order of Investigation before August 12, 2011; Patriarch contends accordingly that, whether the Claim is excluded under the Warranty is a disputed question of fact that must be decided by a jury. Second, Patriarch contends that the Warranty phrases "Claim under the Captioned Policy" and "Claim covered by such Captioned Policy" referred only to Claims giving rise to losses in excess of $20 million because the Axis Policy provided coverage only after the underlying policies were exhausted by a particular Claim. Thus, under Patriarch's interpretation, the Warranty excludes coverage only for Claims relating to circumstances of which Tilton herself was aware before August 12 and which Tilton would reasonably have expected to result in a Claim with losses exceeding $20 million.

The parties agree that New York law governs this case. In New York, "[t]he tests to be applied in construing an insurance policy are common speech and the reasonable expectation and purpose of the ordinary businessman." *Ace Wire & Cable Co., v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398 (1983) (internal citations omitted). Insurance coverage exclusions must be stated in "clear and unmistakable" language and are subject to a "strict and narrow construction." *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984). Any ambiguities are to be construed in favor of the insured. *See Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472, F.3d 33, 42-43 (2d Cir. 2006).

Patriarch's position that the Warranty applies only to facts or circumstances subjectively known by Tilton is unsupported by the text of the Warranty, which explicitly refers to facts or circumstances that "Patriarch was aware of." Moreover, "under traditional principles of agency [an] attorney's knowledge must be imputed to [her client]." *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994). Thus, at a minimum, we consider that facts and circumstances that were known not only to Tilton, but to Patriarch's outside counsel and Patriarch's in-house counsel are facts and circumstances that "Patriarch was aware of" for purposes of analyzing the Warranty.

9

Patriarch's position that the Warranty applies only to known facts or circumstances that Patriarch would reasonably have expected to result in a Claim with losses exceeding the $20 million in underlying policies is also not established by the text of the Warranty. The Warranty's use of the capitalized term "Claim" indicates that it is a defined term and thus means "Claim" as defined in the CNA Policy. The CNA Policy definition of "Claim" is not limited in the manner Patriarch urges. It is true that the Warranty refers both to Claims "under" the Axis Policy—a term best understood to mean "defined by"—and to Claims "covered by" the Axis Policy. Patriarch insists that the Axis Policy "covers" only Claims whose losses exceed $20 million. Reading the Warranty as a whole, however, and taking into consideration its context and purpose, we are not persuaded by Patriarch's interpretation. Because the Axis Policy is a "follow-form" policy, the same Claims that are "covered by" the CNA Policy are also "covered by" the Axis Policy and other underlying excess policies. That Axis provides excess insurance does not change or limit the class of Claims that it provides coverage for; it changes only the circumstances under which Axis must pay for losses resulting from such Claims.[4] The only reasonable interpretation of the Warranty, in our view, is that it excludes claims arising from facts or circumstances of which Patriarch was aware as of August 12 and that Patriarch would reasonably have expected to result in a Claim as defined by the CNA Policy.

Patriarch urges us to consider deposition testimony that, it contends, demonstrates that Axis employees involved in the drafting of the Warranty intended Patriarch's limiting interpretation. But this Court may consider extrinsic evidence only to resolve ambiguities

---

[4] Our decision in *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46 (2d Cir. 2010), does not require a different conclusion. *Lumbermens* involved materially different policies with materially different terms. The excess policy in *Lumbermens*, which did not follow the primary policy, required notice "whenever it appears likely it will result in a claim *involving this Coverage Part*." *Id.* at 54 (Kearse, J., dissenting) (emphasis added). Because the excess policy had its own notice provision, it was clear that "involving this Coverage Part" meant "involving excess coverage." Relying on caselaw from Michigan—the law under which the contract was construed—we concluded that "involving excess coverage" had previously been interpreted to mean "actually being implicated through liability," and thus that notice was required under the excess policy only when it was likely that a claim would exceed the underlying policy. *Id.* at 51-52. The textual differences— "covered by" or "under" as opposed to "involving"—and the fact that the excess Axis Policy follows the underlying policies and therefore defines "Claim" identically, renders *Lumbermens* largely inapposite.

10

that exist on the face of an agreement. *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162-163 (1990). Whether such ambiguities exist is a question of law to be resolved by courts. *Id.* at 162. For the reasons set out above, we conclude that the Warranty, "read as a whole to determine its purpose and intent," *id.*, contains no ambiguity. We therefore decline to consider the extrinsic evidence that Patriarch offers to support its interpretation of the Warranty.

By August 12, 2011, the effective date of the Warranty, Patriarch "was aware" of the SEC Order of Investigation, the escalating severity and focus of the SEC investigation, the subpoena of a former employee, and notice of an impending subpoena to be issued to Patriarch itself. It also "was aware" of the SEC's focus on at least the Zohar CLOs. Further, Patriarch had accrued over $390,000 in legal expenses for outside counsel in responding to the SEC's requests of it by the time Tilton executed the Warranty. These sums were in addition to the retainers and legal expenses that Patriarch had committed to provide for Kaloudis and Topbas, which, when billed in late September, amounted to nearly $200,000.

We conclude that, contrary to the representations made in the Warranty, Patriarch was "aware" that the SEC had become more—not less—insistent in its demands of Patriarch, despite Patriarch's accrual of hundreds of thousands of dollars in legal costs to prevent such escalation. These are "facts and circumstances" that could reasonably be expected to give rise to a Claim under the Axis Policy. Indeed, Patriarch conceded in its briefing on appeal that "[t]he SEC's contacts with Patriarch and two former employees prior to the effective date of the AXIS Policy were an indication that a Claim might be asserted against Patriarch in the future." Appellant's Br. at 50. The Warranty thus excludes Patriarch's losses arising from its defense of the SEC investigation Claim from coverage under the Axis Policy.

* * *

We have considered Patriarch's remaining arguments and conclude that they are without merit. For the reasons set forth above, the judgment of the District Court is **AFFIRMED.**

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

12